seem to indicate that the slippery surface of the middle of the walk was not due either to the plan of the walk, or to the materials used, but to the manner in which the work was done; in other words, to a defective construction.

The jury properly found that this fact was established; and defendant should not escape responsibility for the existence of this defect by urging the quasi judicial plea.

KRUSE, J., concurs.

---

(139 App. Div. 542.)

### TICONDEROGA R. CO. v. DELAWARE & H. CO.

(Supreme Court, Appellate Division, First Department. July 7, 1910.)

RAILROADS (§ 138*)—CONTRACT BETWEEN RAILROAD COMPANIES—CONSTRUCTION.

A contract between plaintiff and defendant railroad companies recited: That plaintiff, being interested in the village of T., which had inadequate railroad facilities, agreed to construct a railroad from the village to connect with a road operated by defendant, and procure necessary legislation authorizing transportation at minimum rates therein recited; defendant agreed to operate such road; taxes to be paid by plaintiff, including corporation franchise tax, excluding tax on rolling stock, which should be paid by defendant; defendant to assume all the duties, liabilities, etc., incident to maintenance, except as otherwise specified, but not to be liable for debts of the plaintiff. Clause 7 provided, by subdivision 1, that defendant might retain 25 per cent. of the annual gross earnings "as full compensation for managing, operating and maintaining said railroad," the remaining 75 per cent. to be appropriated as follows: First, to pay all taxes and assessments, excluding tax on rolling stock to be paid by defendant; second, to pay interest charges on bonded indebtedness not over a certain amount; third, to deposit a sinking fund to liquidate bonds of indebtedness; fourth, to pay to plaintiff all moneys received in excess of that required to meet expenditures above stated to the extent of a sum sufficient to pay a dividend not to exceed 5 per cent. above its capital stock, which should not exceed $30,000. Subdivision 5, "to pay to defendant any unexpended balance that may remain after appropriating the aforesaid amounts, to be applied in paying the cost of extension or improvements so far as it may find the same necessary." *Held*, that the first provision of clause 7 that defendant might retain 25 per cent. of the gross earnings "as full compensation," did not control the last subdivision of that clause, and it was error to hold that surplus remaining after paying for extensions or improvements belonged to the plaintiff rather than the defendant.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 437; Dec. Dig. § 138.*]

Appeal from Judgment on Report of Referee.

Action by the Ticonderoga Railroad Company against the Delaware & Hudson Company. From a judgment for plaintiff, entered on report of referee, defendant appeals. Reversed, and judgment ordered for defendant.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

---

Morgan J. O'Brien, for appellant.

William H. Button, for respondent.

SCOTT, J. · Defendant appeals from a judgment entered upon the report of a referee.

There is no substantial dispute as to the facts; the whole controversy turning upon the proper construction to be put upon a contract made between the parties on August 13, 1890. Both of the parties are railroad corporations; the plaintiff owning a small line of road not exceeding 2½ miles in length, and the latter owning or leasing and operating an important line extending from Albany, N. Y., northward to the Canadian border, with a branch running to Baldwin, near the northerly end of Lake George. In the year 1889 the plaintiff was organized under the laws of the state of New York, by a number of the inhabitants of the villages of Ticonderoga and Glens Falls; the dominant purpose in the minds of the incorporators apparently being to benefit the village of Ticonderoga, and the business interests located therein, by affording better connections than then existed between said village and the defendant's railroad. The capital stock of plaintiff was fixed at $30,000, and it issued an equal amount of bonds secured by a mortgage. Having determined to build its road, plaintiff entered into a contract with defendant for the operation thereof, procuring from the Legislature, apparently with some aid from the defendant, a special act authorizing it to charge the unusual rate of fare of 25 cents per person for passage one way over the whole or any part of its railroad. In order to arrive at a just conclusion upon the particular question raised by this appeal, it will be necessary to consider the whole scope and tenor of the contract, including the preamble, which discloses at once the object which plaintiff's incorporators had in view, and the reasons which led to making the contract with the defendant. The contract was as follows:

"This agreement, made this 13th day of August, 1890, by and between the president, managers and company of the Delaware & Hudson Canal Company of the first part, and the Ticonderoga Railroad Company, of the second part, witnesseth:

"Whereas, the first party is a corporation duly organized under and by virtue of the laws of the state of New York, with power to lease and operate railroads within said state, under and by virtue of chapter 841 of the Laws of 1867 of said state; and whereas, said first party with due authority is lessee in the possession, management and operation of the New York & Canada Railroad, which said railroad extends from the village of Whitehall, Washington County, New York, to the village of Plattsburgh, Clinton county, New York, and by branch (known as the Baldwin Branch) to the village of Baldwin at the foot of Lake George; and whereas, said Baldwin Branch extends from the main line of the New York & Canada Railroad to the village of Baldwin, a distance of about five miles, on very high ground passing the village of Ticonderoga on the south about three-quarters of a mile therefrom, and at a considerable elevation above the same; and whereas, said village of Ticonderoga is a thriving manufacturing village located upon a stream, the outlet of Lake George, which affords water power and natural facilities for the development of manufacturing industries of an unusual order; and whereas, the industrial development of said village and surrounding territory has been impeded on account of the lack of adequate and convenient railroad facilities and also by reason of the necessity for carting all freight up a very steep grade to the Academy Station on the Baldwin Branch,

about three-quarters of a mile, or to Addison Junction on the main line about two and one-half miles, thereby imposing very heavy charges for cartage on all such freights and placing manufacturers at a great disadvantage in competition with those located on other roads; and whereas, the said first party is desirous of promoting the industrial development of said village and territory, and removing the disabilities that now operate against the manufacturers and shippers, and thus secure an increase of traffic upon said railroad at the smallest expense to itself; and whereas, the second party is a corporation duly organized by the citizens of said village, under and by virtue of the laws of this state, for the purpose of constructing a railroad from said village of Ticonderoga, or a point west therefrom upon said outlet at Lake George, by the most feasible route, to connect at a convenient point with said Baldwin Branch; and whereas, said proposed road can be . most economically operated by said first party as a side or switch track, at but a slight expense over that required to handle the freight and passenger traffic of said village with present imperfect facilities:

"Now, therefore, in consideration of one dollar by each party to the other in hand duly paid, receipt thereof is hereby acknowledged, and in consideration of the premises and of the faithful performance of the covenants and agreements hereinafter contained, it is mutually agreed as follows: .

"First. The party of the second part agrees to construct a single-track railroad from a point at or near the village of Ticonderoga, Essex county, New York, by the most feasible route established by its engineer to connect with said Baldwin Branch at a convenient point to be established by said engineer, which said railroad it is estimated will be about two miles in length. The said road shall consist of steel rails weighing not less than sixty-seven pounds to the yard, and shall comprise a sufficient freight and passenger station at the village of Ticonderoga, with the usual and necessary switches, side tracks and other appurtenances. All of such construction shall be done in first-class manner and shall conform in all respects to the requirements of the chief engineer of the Delaware & Hudson Canal Company.

"Second. The party of the second part agrees to procure such legislation as may be necessary to authorize and permit charges for transportation upon said railroad to be made at not exceeding the following rates, viz., for each passenger, twenty-five cents; for each gross ton of factory or mill supplies or products, twelve and one-half cents, and for each ton of general merchandise, seventy-five cents. None of the provisions of this contract shall be binding upon the party of the first part, unless and until such necessary legislation and such authority and permission shall be obtained.

"Third. Upon the completion of said proposed railroad, said first party agrees to take possession thereof, and maintain, manage and operate the same, and provide the freight and passenger connection with all day trains on the New York & Canada Railroad that may stop at Addison Junction, upon the terms and conditions hereinafter specified, during the corporate existence of said second party.

"Fourth. It is mutually agreed that all taxes and assessments against said proposed road shall be paid by the second party, including corporation franchise tax, but excluding tax on rolling stock, which shall be paid by the first party.

"Fifth. It is mutually agreed that the first party, so far as it lawfully may, shall assume all the duties, obligations, liabilities, rights, privileges and franchises of the second party incident to the maintenance and operation of said proposed road, except as herein otherwise specified, but the said first party shall in no event be liable or responsible for any debts or liabilities of the second party, for whatever purpose the same may have been incurred.

"Sixth. It is mutually agreed that in the operation of said proposed railroad of the party of the second part, the charges for transportation of freight shall not exceed twelve and one-half (12½) cents per gross ton for all freight to or from any manufactory for manufacturing purposes (over the whole or any part of said proposed road) and shall not exceed a minimum rate of seventy-five (75) cents per ton for all other freight. The charge for

passenger traffic shall not exceed twenty-five (25) cents for each person one way over the whole or any part of said Ticonderoga road.

"Seventh. It is mutually agreed that the party of the first part may retain twenty-five per cent. of the annual gross earnings derived from all traffic upon said Ticonderoga Railroad, as full compensation for managing, operating and maintaining said railroad, and the remaining seventy-five per cent. of such annual gross earnings shall be appropriated and used by them as follows, viz:

"(1) To pay all taxes and assessments levied against said second party or against said first party as operators of, and on account of, said proposed road of the second party including corporation franchise tax, but excluding tax on rolling stock, which shall be paid by first party.

"(2) To pay interest charges on bonded indebtedness, which interest charges shall not exceed eighteen hundred dollars per annum.

"(3) To deposit with three trustees to be appointed when mortgage is executed for a sinking fund to liquidate its bonded indebtedness when due, a sum not to exceed one thousand dollars per annum over and above the expenditures required by the first two mentioned items.

"(4) To pay to the party of the second part all moneys received in excess of that required to meet the expenditures above stated to the extent of a sum sufficient to pay a dividend not to exceed five per cent. (5%) upon its capital stock, which capital stock shall not exceed thirty thousand dollars.

"(5) To pay to the first party any unexpended balance that may remain after appropriating the aforesaid amounts, to be applied in paying the cost of extension or improvements, so far as it may find the same necessary."

The controversy arises over the construction to be given to the fifth and last subdivision of the seventh article, and the disposition to be made of what may be termed the surplus income of the road, after retention by defendant of 25 per cent. of the gross receipts, and the payments by defendant, out of the remaining 75 per cent. of said gross receipts, of the various sums agreed to be paid by the first, second, third, and fourth subdivisions.

It appears that such surplus has amounted to a very considerable sum, much larger than defendant has, up to the present time, found necessary to expend in extensions or improvements of plaintiff's road. The referee has awarded all of this accumulated surplus, except a small sum to be retained for possible extensions and improvements, to plaintiff, together with interest thereon, upon the theory that the contract quoted above established a trust relation between plaintiff and defendant, whereby defendant possessed and operated the railroad as trustee for plaintiff, collecting the revenue therefrom in plaintiff's right and as its agent, and consequently being bound to account to plaintiff for all of the receipts, after paying therefrom the several sums specified in the seventh clause. The learned referee has given much attention to the question whether the contract can properly be denominated a lease, under which defendant would collect the revenue from the railroad in its own right as lessee, being required to pay by way of rent, the several sums specially agreed to be paid, and entitled, as lessee, to retain whatever surplus income might remain. He concluded that the contract should not be considered a lease, being led to that conclusion in large part because the document nowhere contains the words "lease" or "lessor" or "lessee." It is equally true that the contract nowhere contains the words "trust" or "trustee" or "agent," so that we cannot determine the relation which the parties undertook to establish between themselves by any specific words in

the contract defining that relation, and are relegated to a general review of the whole paper in order to arrive at their true relations, and the rights and obligations reserved and assumed by each.

The preamble indicated very clearly that, as has already been remarked, the primary purpose of plaintiff in undertaking the construction of its road was to insure improved railway facilities for the village of Ticonderoga, and to promote its industrial development, a purpose which is further indicated by the sixth clause of the contract, which restricts the freight charges which might be exacted. It is further indicated by the preamble that in the estimation of plaintiff its primary purpose could be best attained if the railway was turned over, for operating purposes, to the defendant. Following upon this clear expression of the purpose for which the road was built, and the reason for contracting with defendant to run it, comes the contract itself.

By the first clause plaintiff undertook to construct the railroad, which it is agreed should be done in first-class manner, and to conform in all respects to the requirements of defendant's chief engineer, showing at the very outset an intention to devolve certain authority over the railway upon defendant. By the second clause the plaintiff agrees to procure legislation to authorize and permit the charges to passengers and freight transportation, which by the sixth clause are made the minimum which might be charged. The procuring of such legislation was deemed so important that it was provided that none of the terms of the contract should be deemed binding upon the defendant until such authority and permission should be obtained. By the third and fifth clauses provision is made for turning over the property to the defendant, and, short of an absolute deed of conveyance, nothing could be more complete. Defendant agreed, upon completion of the railroad, to take possession thereof and maintain, manage, and operate the same, and provide freight and passenger connections during the whole period of the corporate existence of plaintiff, and, as if to emphasize the completeness of the transfer, it was mutually agreed that the defendant should, in so far as it lawfully might, assume all the duties, obligations, liabilities, rights, privileges, and franchises of plaintiff incident to the maintenance and operation of the road, except that it should not become liable or responsible for any debts or liabilities of plaintiff for whatsoever purpose the same may have been incurred. By the fourth clause the plaintiff assumes the payment of all taxes and assessments against the said road, including corporation franchise tax, but excluding tax on rolling stock which was to be paid by defendant.

If it were necessary to give to this contract a conventional name, it certainly much resembles a lease to defendant, for the whole term of plaintiff's corporate existence, of the franchise, and railroad with its incidents and appurtenances. Although nowhere so stated in precise terms, it is obvious that this contract implied and contemplated that defendant, as the operator of the road, should collect and receive the revenues, and the seventh clause provided how these revenues should be applied. Before making any payments defendant was to retain 25 per cent. to cover operating expenses. Out of the remaining 75

per cent. defendant agreed to make the following payments: First. Taxes and assessments, which by the fourth clause were expressly declared to be obligations of the plaintiff. Second and Third. Interest on the bonded indebtedness and an annual sum towards a sinking fund, whch were obligations of plaintiff, and which, by the fifth clause, it was expressly agreed should not be assumed by defendant. Fourth. A sum sufficient to pay a dividend of 5 per cent. upon the capital stock of plaintiff. Then followed the subdivision in dispute as to the disposition of any surplus that might remain. Before proceeding to consider that subdivision analitically, we may examine the general scheme outlined in the subdivisions above referred to.

The referee was much impressed with the language of the contract as to the 25 per cent. of the gross receipts to be retained by defendant, and, indeed, that language seems to have largely controlled his construction of the contract. That language is that defendant may retain 25 per cent. of the gross earnings of the road "as full compensation for managing, operating and maintaining said railroad." This was deemed by the referee to be an agreement that under no circumstances nor conditions was defendant to be entitled to any more of the gross receipts than 25 per cent. thereof. If this clause stood alone, and if the contract was merely one of agency, such a construction might well be accepted. But it does not stand alone, and the contract is not merely one of agency. The seventh clause is not merely one to provide what payments should be made out of the income, but also one specifying the order in which different classes of claims against plaintiff should be paid. A certain percentage was first allowed for operating expenses, because without operation no income could be earned. Next in order of priority came taxes, interest, sinking fund, and, lastly, dividends. Of course, when the contract was made no one could foretell with certainty what income would be realized, and the whole effect of the first four subdivisions of the seventh clause was that, after retaining a specified percentage for operating expenses, the defendant would, if the income proved to be sufficient, make the other payments specified; thus, if the road was successful, paying all of plaintiff's obligations for taxes, assessments; and the interest and principal of its bonds, with a dividend of 5 per cent. to the stockholders. In our opinion the provision that defendant should retain 25 per cent. of the gross receipts "as full compensation for managing, operating and maintaining said railroad" had reference to the first four subdivisions of the clause, and simply meant that, in estimating how much should be paid for the purposes specified in those subdivisions, the retained 25 per cent. should be accepted by defendant as full compensation.

The fifth subdivision, which deals with any surplus which might remain, after the payments specially provided for, covers two subjects, viz., the party to whom it was to be paid, and the purpose to which it was to be applied. By its first phrase the defendant undertakes "to pay to the first party (the defendant) any unexpended balance that may remain after appropriating the aforesaid amounts." If the subdivision had stopped there, no question could have arisen. It

would have been perfectly clear that the intention of the contract was that defendant was to keep and retain as its own all the surplus revenues. The words that follow, while they indicate the purpose for which the surplus is to be retained by defendant, do not qualify its right to receive and retain that surplus. It is "to be applied in paying the cost of extensions or improvements so far as it (the defendant) may find the same necessary." It is a reasonable construction of this phrase that, if defendant shall find extensions or improvements necessary, the cost thereof shall be defrayed out of the accumulated surplus income, and that plaintiff shall not be called upon to pay therefor; but beyond that can we find neither in this phrase, nor in any other part of the contract, anything which qualifies the explicit provision that the unexpended balance, after making the specified payments, shall be paid to the defendant. And that these balances shall remain the property of defendant is in perfect consonance with the whole scheme of the contract as we construe it.

The plaintiff turned over its property and franchises, for the whole term of its corporate existence, to the defendant absolutely and without reservation or provision for reverter. In return it received assurance that, if the gross receipts were sufficient, its obligations would be met, a dividend paid upon its stock, and that it should not be called upon to bear the expense of extensions and improvements. In this we can find none of the elements of an agency or a trust.

It follows that the judgment appealed from must be reversed, and since, in the nature of the case, the controlling facts could not be changed on a retrial, judgment will be directed for the defendant upon the merits, with costs to the appellant in this court and in the court below. All concur.