THE TICONDEROGA RAILROAD COMPANY, Appellant, *v.* THE DELAWARE AND HUDSON COMPANY, Respondent.

Contract — railroad — construction of contract that a railroad built by one company be operated by another.

Contract, between the Ticonderoga Railroad Company and the Delaware and Hudson Company, by which the latter was to operate a railroad constructed by the former, construed, and *held,* that, after making certain payments from the profits, as required by the contract, the Delaware and Hudson Company is entitled, as trustee and during the life of the contract, to receive and retain the surplus for the purposes specified in the contract.

*Ticonderoga R. R. Co.* v. *Delaware & Hudson Co.,* 139 App. Div. 542, modified.

(Argued December 11, 1911; decided January 23, 1912.)

APPEAL from a judgment entered July 25, 1910, upon an order of the Appellate Division of the Supreme Court in the first judicial department, reversing a judgment in favor of plaintiff entered upon the report of a referee and directing a dismissal of the complaint.

*William H. Button* and *Frederick H. Button* for appellant.

*Morgan J. O'Brien* and *Alfred Opdyke* for respondent.

HAIGHT, J. · This action was brought for an accounting, and that the defendant be adjudged to pay the plaintiff the amount of surplus earnings, if any, that should be found to be due and owing by the defendant. Both parties are railroad corporations, the plaintiff owning a line running from the village of Ticonderoga, about two miles in length, to a point where it makes connection with the defendant's road; the defendant owning or leasing and operating a line extending from Albany, New York, to the Canadian border, with a branch running to Baldwin, near the northerly end of Lake George. The plaintiff company has issued its capital stock to the amount of thirty thousand dollars, and has also issued an equal amount of bonds secured by a mortgage. Having determined to build its road, the plaintiff entered into a contract with the defendant to operate the same, as follows:

"This agreement, made the 13th day of August, 1890, by and between the president, managers and company of the Delaware & Hudson Canal Company, of the first part, and the Ticonderoga Railroad Company, of the second part,

"*Witnesseth :*

"WHEREAS, the first party is a corporation duly organized under and by virtue of the laws of the State of New York, with power to lease and operate railroads within said State, under and by virtue of chapter 841 of the Laws of 1867 of said State; and

"WHEREAS, said first party with due authority is lessee in the possession, management and operation of the New York and Canada Railroad, which said railroad extends from the village of Whitehall, Washington County, New York, to the village of Plattsburg, Clinton County, New York, and by branch (known as the Baldwin branch) to the village of Baldwin at the foot of Lake George; and

"WHEREAS, said Baldwin branch extends from the main line of the New York and Canada Railroad to the village of Baldwin, a distance of about five miles, on very high ground, passing the village of Ticonderoga on the south about three-quarters of a mile therefrom, and at a considerable elevation above the same; and

"WHEREAS, said village of Ticonderoga is a thriving manufacturing village located upon a stream, the outlet of Lake George, which affords water power and natural facilities for the development of manufacturing industries of an unusual order; and

"WHEREAS, the industrial development of said village and surrounding territory has been impeded on account of the lack of adequate and convenient railroad facilities and also by reason of the necessity for carting all freight up a very steep grade to the Academy Station on the Baldwin branch, about three-quarters of a mile, or to Addison Junction on the main line about two and one-half miles, thereby imposing very heavy charges for cartage on all such freights and placing manufacturers at a great disadvantage in competition with those located on other roads; and

"WHEREAS, the said first party is desirous of promoting the industrial development of said village and territory, and removing the disabilities that now operate against the manufacturers and shippers, and thus secure an increase of traffic upon said railroad at the smallest expense to itself; and

"WHEREAS, the second party is a corporation duly organized by the citizens of said village, under and by virtue of the Laws of this State, for the purpose of con-

structing a railroad from said village of Ticonderoga, or a point west therefrom upon said outlet of Lake George, by the most feasible route, to connect at a convenient point with said Baldwin branch; and

" WHEREAS,· said proposed road can be most economically operated by said first party as a side or switch track, at but a slight expense over that required to handle the freight and passenger traffic of said village with present imperfect facilities,

" *Now, Therefore*, in consideration of one dollar by each party to the other in hand duly paid, receipt whereof is hereby acknowledged, and in consideration of the premises and of the faithful performance of the covenants and agreements hereinafter contained, it is mutually agreed as follows:

" *First*. The party of the second part agrees to construct a single track railroad from a point at or near the village of Ticonderoga, Essex County, New York, by the most feasible route established by its engineer to connect with said Baldwin branch at a convenient point to be established by said engineer, which said railroad it is estimated will be about two miles in length. The said road shall consist of steel rails weighing not less than sixty-seven pounds to the yard, and shall comprise a sufficient freight and passenger station at the village of Ticonderoga, with the usual necessary switches, side tracks and other appurtenances. All of such construction shall be done in first-class manner and shall conform in all respects to the requirements of the Chief Engineer of the Delaware & Hudson Canal Company.

" *Second*. The party of the second part agrees to procure such legislation as may be necessary to authorize and permit charges for transportation upon said railroad to be made at not exceeding the following rates, viz., for each passenger, twenty-five cents; for each gross ton of factory or mill supplies or products, twelve and one-half cents, and for each ton of general merchandise, seventy-five cents. None of the provisions of this contract shall be binding upon the party of the first part unless and

until such necessary legislation and such authority and permission shall be obtained.

" *Third.* Upon the completion of said proposed railroad, said first party agrees to take possession thereof, and maintain, manage and operate the same, and provide the freight and passenger connection with all-day trains on the New York and Canada Railroad that may stop at Addison Junction, upon the terms and conditions hereinafter specified, during the corporate existence of said second party.

" *Fourth.* It is mutually agreed that all taxes and assessments against said proposed road shall be paid by the second party, including corporation franchise tax, but excluding tax on rolling stock, which shall be paid by the first party.

" *Fifth.* It is mutually agreed that the first party, so far as it lawfully may, shall assume all the duties, obligations, liabilities, rights, privileges and franchises of the second party incident to the maintenance and operation of said proposed road, except as herein otherwise specified, but the said first party shall in no event be liable or responsible for any debts or liabilities of the second party, for whatever purpose the same may have been incurred.

" *Sixth.* It is mutually agreed that in the operation of said proposed railroad of the party of the second part, the charges for the transportation of freight shall not exceed twelve and one-half cents per gross ton for all freight to or from any manufactory for manufacturing purposes (over the whole or any part of said proposed road) and shall not exceed a minimum rate of seventy-five cents per ton for all other freight. The charge for passenger traffic shall not exceed twenty-five cents for each person one way over the whole or any part of said Ticonderoga road.

" *Seventh.* It is mutually agreed that the party of the first part may retain twenty-five per cent of the annual gross earnings derived from all traffic upon said Ticonderoga Railroad, as full compensation for managing, operating and maintaining said railroad, and the remaining

seventy-five per cent of such annual gross earnings shall be appropriated and used by them as follows, viz.:

" *First*. To pay all taxes and assessments levied against said second party or against said first party as operators of, and on account of, said proposed road of the second party including corporation franchise tax, but excluding tax on rolling stock, which shall be paid by first party.

" *Second*. To pay interest charges on bonded indebtedness, which interest charges shall not exceed eighteen hundred dollars per annum.

" *Third*. To deposit with three trustees to be appointed when mortgage is executed for a sinking fund to liquidate its bonded indebtedness when due, a sum not to exceed one thousand dollars per annum over and above the expenditures required by the first two mentioned items.

"*Fourth*. To pay to the party of the second part all moneys received in excess of that required to meet the expenditures above stated to the extent of a sum sufficient to pay a dividend not to exceed five per cent upon its capital stock, which capital stock shall not exceed thirty thousand dollars.

" *Fifth*. To pay to the first party any unexpended balance that may remain after appropriating the aforesaid amounts, to be applied in paying the cost of extension or improvements, so far as it may find the same necessary."

The referee has found in substance that after the plaintiff corporation had constructed its road of about two miles in length to a point where it intersected the Baldwin branch of the defendant's road, the defendant entered into the possession of the road and has ever since operated it under the provisions of the contract, and that out of the gross earnings it had paid the taxes, interest upon the bonded indebtedness, a thousand dollars to create a sinking fund for the retirement of the bonds when due, five per cent dividend to the stockholders each year, and had accumulated in its hands a reserve fund amounting at that time to $112,796.97; that $15,000.00 was a sufficient amount to reserve in the defendant's hands, and that the bal-

ance, together with the interest thereon, amounting to $56,380.33, making in the aggregate the sum of $154,177.30, should be paid over to the plaintiff's stockholders. The Appellate Division having unanimously reversed the judgment entered upon the report of the referee upon both the facts and the law, this court has no power to review the same in view of the fact that its jurisdiction is limited to the review of questions of law only unless it appears that there was no material, controverted question of fact or of inferences to be drawn therefrom. (*Otten* v. *Manhattan Ry. Co.*, 150 N. Y. 395.)

The main question discussed by the learned referee and the Appellate Division pertains to the construction that should be adopted with reference to the provision of the contract. The referee appears to have reached the conclusion that under the contract the defendant company became a trustee of the stockholders of the plaintiff company, by which it agreed to operate the road during its corporate life for twenty-five per cent of its gross earnings, and that out of the remaining seventy-five per cent it, as such trustee, would annually pay the taxes, the interest on the bonded indebtedness, one thousand dollars to the commissioners of the sinking fund for the retirement of the bonds at their maturity, five per cent dividend to the stockholders, and retaining the balance for the purpose of paying the cost of extension or improvements, so far as it may find the same necessary, and consequently that the surplus belonged to the stockholders of the plaintiff company. In support of such conclusion special attention is called to the provision of the seventh clause of the contract, in which it is mutually agreed by the parties that the defendant company "may retain twenty-five per cent of the annual gross earnings derived from all traffic upon said Ticonderoga Railroad, as *full compensation* for managing, operating and maintaining said railroad." Special stress is laid upon the words "full compensation," and attention is called to correspondence that took place between the officers of the respective companies before the contract was executed,

and to the annual report made by the companies to the state. On the other hand, the Appellate Division appears to have reached the conclusion that the contract was in effect a lease by the plaintiff company to the defendant for the entire period of its corporate existence; that the provision, quoted from the seventh clause of the contract, pertained only to the cost of operation, which was first to be retained by the defendant to cover its expenses; and that the following provisions with reference to the payment of taxes, interest, sinking fund and dividends followed in their order, together with the costs of necessary extensions and improvements, before the defendant was entitled to · any profit out of the operation of the road; and consequently that the provision of the seventh clause pertained to cost of operating only, and not to profits to be derived from such operation, if any. In support of this construction special attention is drawn to subdivision four of the seventh clause of the contract, in which the defendant agrees to pay to the plaintiff company out of the "moneys received in excess of that required to meet the expenditures above stated to the extent of a sum sufficient to pay a dividend *not to exceed five per cent* upon its capital stock, which capital stock shall not exceed thirty thousand dollars." In addition to that we have the sixth clause of the contract, in which the plaintiff company was careful to limit the charges for transportation of freight and passengers that should be made by the defendant company to an amount not exceeding the sum specified, which is urged as being inconsistent with the theory that the plaintiff company was to receive the surplus. Our attention has also been called to the fact that for six years the defendant company rendered to the plaintiff an annual report showing a surplus each year, thereby advising the stockholders that there was a surplus, and that for seventeen years they made no claim that they were entitled to such surplus or any part thereof. Our attention is also called to the correspondence and to the annual reports as sustaining such conclusions.

It is conceded that the provision of clause seven, sub-division five, of the contract is ambiguous. It does not in express terms disclose which party shall be entitled to the surplus that remains after using such fund as may be necessary for extensions and improvements. It is as follows: "To pay to the first party (the defendant) any unexpended balance that may remain after appropriating the aforesaid amounts, to be applied in paying the cost of extension or improvements, so far as it may find the same necessary." That is, after the defendant has retained twenty-five per cent of the gross earnings for the cost of its operation of the road and has paid the taxes, interest, sinking fund and dividend to the stockholders, then that which remains is to be paid to itself, to be applied in paying the cost of extension or improvements, so far as it may find the same necessary. It being ambiguous as to the particular to which attention has been called, it becomes necessary to consider not only the provision of the contract but the correspondence under which it was executed, the discussion of the parties at the time, so far as it bears upon the subject in controversy, and the manner in which it was subsequently considered and treated by them in order that their true intent may be determined. This presents a situation involved in fact and the inferences that may be drawn therefrom. Under the view taken by us of another question in this case, a determination of this question is not now necessary, and it may never arise again.

Whatever name is given to the contract does not affect the question which we are now to consider, for under its provisions we deem it clear that the defendant holds the surplus, to be applied in paying the cost of extension or improvements, so far as it may find the same necessary. As operator of the road, the defendant is interested in having its tracks, roadbed and bridges maintained in such condition as to permit of its operation with safety to itself, its employees and to the public. It is interested in extending its tracks so as to accommodate factory and business enterprises which tend to advance the business

of the defendant. It is for the interest of the plaintiff's stockholders that the road should be maintained and rebuilt when necessary, to the end that at the termination of the lease they may come into their property in good condition. The provision of the seventh clause, already alluded to, in which the defendant undertakes to operate and maintain the road, has reference to the ordinary daily repairs necessary in operating a road of this character. This apparently was understood by the parties, for in subdivision five of the clause alluded to, we find that the balance is to be retained by the defendant for improvements, so far as the same may be necessary, which would include rebuilding when worn out. This view was also taken by us in *People ex rel. Jamaica Water Supply Co.* v. *State Board of Tax Commissioners* (196 N. Y. 39–57), in which WILLARD BARTLETT, J., in speaking for the court, says: "We suppose that judicial notice may be taken of the fact that in the conduct of many industrial enterprises there is a constant deterioration of the plant which is not made good by ordinary repairs which, of course, operates continually to lessen the value of the tangible property which it affects. The amount of this depreciation differs in different enterprises, but the annual rate is usually capable of estimate and proof by skilled witnesses. No corporation would be regarded as well conducted which did not make some provision for the necessity of ultimately replacing the property thus suffering deterioration."

This railroad was constructed and taken over by the defendant in 1890. It has now been in use for twenty-one years, and the time necessarily will soon arrive when it will become necessary to reconstruct or renew the railroad in whole or in part. The original cost of construction was about sixty thousand dollars, which was paid for by the issue of thirty thousand dollars in bonds and thirty thousand dollars in stock. We are also aware that in the operation of railroads unforeseen accidents may occur through fire, storms and floods resulting in great damage and involving a large expenditure of money in

restoring the buildings and road. The public service commission is invested with power to regulate rates and charges that should be made for the transportation of persons and property by the railroads of the state, and it may reduce the charges and thus lessen the surplus. The parties in entering into this contract evidently had in mind some of the necessities for the expenditure of money in the future, either through reconstruction or losses by unavoidable accidents, and saw fit to create a fund to meet such contingencies by reserving the surplus earnings for that purpose. The referee, as we have seen, has ordered judgment that all of this fund, except the sum of fifteen thousand dollars, be now paid over to the plaintiff for the purpose of distribution among its stockholders, thus, in effect, paying a dividend on the stock of five hundred per cent. This, it appears to us, is in violation of the express provision of the contract, which is, in substance, that the annual dividend paid upon the capital stock shall "not exceed five per cent." It is also in violation of the express provision of the contract which pays over to the defendant any unexpended balance that may remain, making it the custodian of the fund, to be applied for the purpose specified in the contract. We think the referee had no power to decree such a distribution of the fund. It appears to us that the surplus earned is, by the terms of the contract, placed in the hands of the defendant, and is in the nature of a trust fund in which both the plaintiff and the defendant have an interest. It is to be used for the purpose specified in the contract. True the defendant is given discretionary power to determine the necessity of its use, but this power must be exercised within reasonable bounds; and if it neglects to use it for necessary extensions or improvements, it may be compelled to do so at the instance of the plaintiff. No time is specified in the contract during which this fund shall be held by the defendant, and it, therefore, necessarily follows that it must be continued during the lifetime of the contract, which is fifty years. It is possible that contingencies may arise in the future,

which now cannot be foreseen by the court, in which it will become necessary to expend the entire fund. If, however, at the termination of the contract there should be an unexpended balance of the fund still remaining, then and in that event the courts may be again called upon to determine the question as to which of the parties is entitled to it.

This action was brought for an accounting, as well as for the distribution of the surplus fund. We think that the plaintiff was entitled to maintain the action, to the extent of having an account taken and the amount of the surplus determined. The defendant, as we have already shown, had an interest in the fund, at least to the extent of having the road extended and improved, as specified in the contract. Upon the accounting had before the referee there was a conflict in the views of the respective parties as to the amount of the earnings of the plaintiff's road. It appears that the plaintiff's road intersected the defendant's road at a point about two miles distant from the village of Ticonderoga; that there was no station at that point, and consequently the trains over the plaintiff's road were run by the defendant from the point of intersection with its own road to the next station. The referee has charged the defendant with the amount that it collected for passengers and freight from the village of Ticonderoga to the defendant's station upon its own line. The defendant claims that it could only be charged proportionately with the amount which the mileage of the plaintiff's road bears to the mileage on the defendant's road. It may be that some reason exists why the mileage basis should not be adopted in determining this question, but it would seem equitable that the defendant should be credited with some portion of the earnings. Another question has arisen with reference to the amount of interest with which the defendant should be charged. The defendant instead of investing the surplus fund separately from its own fund, as it should have done, paid the same over into the treasury of the company, where the moneys became mingled with

the moneys of the company. This it claims to have done in good faith, under the belief that it was entitled to the surplus. The referee, however, in substance, has found bad faith on the part of the defendant, and that consequently it should be charged with six per cent interest. The rule is that with a diligent trustee he should be charged with only such interest as he had been able to collect. We think, therefore, that the judgment should be reversed and the order of the Appellate Division should be modified so as to direct a new trial, and as modified the order of the Appellate Division should be affirmed, with costs to abide the event.

VANN, J. I concur in the result reached by Judge HAIGHT, but as I have some views which he has not expressed, I will briefly announce my conclusions without much effort at argument.

The primary question is, what does the contract mean? This, as I think, is a question of law which we should now decide, so that both parties may know their rights and understand their legal relations to each other during the long period that their contract yet has to run. The meaning of a written agreement is rarely a question of fact, although in case of doubt surrounding circumstances may be taken into account, so that the court may read the instrument in the same light that the parties wrote it.

The contract is not a lease, either in form or substance, any more than an agreement to work a farm. The terms, conditions and covenants usually found in leases are wholly wanting. There is no rent reserved, no exclusive right to income and no covenant to pay rent, as such, or in effect. On the other hand, compensation, expressly named as such, is provided through a division of gross earnings to pay one party for "managing, operating and maintaining" the railroad belonging to the other.

No express trust was created, for the elements of such a relation are absent. Title to the railroad property continued in the original owner, while the other party was

to perform certain services with reference thereto for a compensation prescribed. The defendant was entitled to possession for a specified period, but simply to enable it to manage and operate the plaintiff's road.

What, then, was the relation between the parties as created by the contract ? When that relation began the defendant was an old railroad company, operating a long line of road, fully equipped with the rolling stock, men and appliances necessary to manage not only its own road but also any short road connecting therewith that it might acquire the right to operate. Thus, without much increase of expense by adding a short line as a "feeder," it could enlarge the business of its main road. On the other hand, the plaintiff was simply a road on paper, duly organized as a railroad corporation, with its road projected but not built. As described in its charter, its road was to extend from a branch of the defendant a distance of two miles through the village of Ticonderoga, past one manufactory and to another. It had the right to issue bonds and stock to build its road, but it could not itself operate a line only two miles long to advantage. As the contract recited, "such proposed road can be most economically operated by said first party (the defendant) as a side or switch track, at but a slight expense over that required to handle the freight and passenger traffic of said village with present imperfect facilities." Ticonderoga, as it is further recited, was a "thriving manufacturing village," with "water power and natural facilities for the development of manufacturing industries of an unusual order." It was situated about three-quarters of a mile from a branch of the defendant, which was built "on very high ground * * * and at a considerable elevation above" the village. The plaintiff wanted to build the road, for its projectors were interested in the manufacturing plants reached by it. The defendant wanted the road built so as to use it as a feeder to its own "and thus," as was also recited, "secure an increase of traffic upon said railroad at the smallest expense to itself." While the plaintiff was willing to build the road, it could

not well operate it, and the defendant was willing to operate it, but did not wish to build it.

Such being the situation, the parties came together and entered into the contract, which I regard as an operating agreement between principal and agent, which implies a trust relation, but not that of *cestui que trust* and trustee. The plaintiff agreed to build the road wholly at its own expense with steel rails of a specified weight, "a sufficient freight and passenger station at the village of Ticonderoga, with the usual and necessary switches and side tracks and other appurtenances." All the construction was to be done in first-class manner and to " conform in all respects to the requirements of the Chief Engineer of the Delaware & Hudson Canal Company." The plaintiff also agreed to procure the legislation necessary to authorize charges not exceeding twenty-five cents for each passenger, twelve and one-half cents for each ton of factory supplies or products, and seventy-five cents for each ton of general merchandise. It was stipulated that no provision of the contract should bind the defendant unless such legislation was secured. The factory rate thus prescribed was very low, the rate for general freight very high and the rate for passengers almost unprecedented. After the plaintiff had performed these stipulations the defendant was to take possession, maintain, manage and operate the road and provide freight and passenger connection with all day trains on its own road during the corporate existence of the plaintiff, which was fifty years. These were the special promises of the respective parties, the remaining provisions being mutual by express statement.

After thus providing for the construction of the road by one party and the operation thereof by the other, it was mutually agreed that the gross earnings should be disposed of as follows: The defendant was to "retain twenty-five per cent of the annual gross earnings derived from all traffic upon said Ticonderoga Railroad, as full compensation for managing, operating and maintaining said railroad." The remaining seventy-five per cent was

to be used in the payment of taxes and interest on bonds, while not to exceed $1,000 per annum was to be deposited with trustees as a sinking fund to pay the bonds when due. Provision was also made for the payment to the plaintiff of all moneys received in excess of that required to meet these expenditures "to the extent of a sum sufficient to pay a dividend not to exceed five per cent upon its capital stock of $30,000." Any unexpended balance after these payments were made was to be retained by the defendant "to be applied in paying the cost of extensions or improvements so far as it may find the same necessary."

When the road was built it belonged to the plaintiff and the defendant had no interest in it except as given by the contract. It was to manage, operate and maintain a railroad belonging to another party and to receive a certain percentage of the gross proceeds in full compensation for such services. It was not to be liable for any debt of the plaintiff, nor to expend a dollar of its own money except to operate the road and not even for that purpose unless its share of the gross receipts was insufficient. When one person agrees to manage another person's property for a definite time at a prescribed compensation, with no transfer of title, the relation of principal and agent exists between them, and the same is true if the two contracting parties happen to be railroad companies. The defendant was not to work for itself but for another, using its property in order to do the work. As it operated the road, it necessarily received the income, not for its own use, however, except to a limited extent, but as agent. It was to retain a certain proportion of the income as full compensation for its services in managing property belonging to another railroad company, and was to devote the remainder to certain specific purposes. I see nothing in the nature of a lease or of an express trust in such an arrangement, but simply an agreement between principal and agent. The relation was fiduciary in character, because the plaintiff intrusted its property to the defendant to manage, receive

the income, and use it for specific purposes. Hence, the defendant was bound to account to the plaintiff at reasonable times and under reasonable circumstances for the income received, even if no part thereof was at the time payable to the plaintiff. Every principal has the right to know how his agent has managed the business intrusted to him and how he has disposed of the proceeds of such business. The accident that each party happens to be a corporation does not affect the right. This action, therefore, was properly brought and the Appellate Division had no power to dismiss the complaint, even if nothing were found due to the plaintiff upon the accounting.

In order that a proper accounting may be had it is necessary to know how the gross earnings are to be disposed of according to the contract. The defendant is to retain twenty-five per cent thereof, in any event, even if there is not enough left to pay the interest and taxes. That is its compensation in full for all services rendered. From the seventy-five per cent remaining, the taxes, interest and a deposit for a sinking fund are to be met and the rest is to be paid to the plaintiff, "to the extent of a sum sufficient to pay a dividend not to exceed five per cent upon its capital stock." There is no controversy over this provision, although it is relied upon as an aid in construing the final stipulation. After all these payments are made the remainder of the gross proceeds is to be paid to the defendant, not, however, for its own use and benefit, but "to be applied in paying the cost of extensions or improvements, so far as it may find the same necessary."

As I read the contract, the twenty-five per cent to be retained by the defendant is not simply for operating expenses, but is in "full compensation for managing, operating and maintaining said railroad," and hence it is all that in any event the defendant can receive under the contract for its own benefit. The words "full compensation" are words of exclusion and forbid the defendant from taking any more as its own property. What

function do these words fill if the defendant was to have all the final residue for itself? Why were they inserted in the contract? Whether the compensation agreed upon was adequate or not, as the defendant agreed to accept it in full it must abide by its promise. This is the plain and natural meaning of the stipulation, as I think, and to so construe it as to allow other compensation than such as was agreed to be accepted in full, would do violence to the intention of the parties as shown by their written agreement.

The defendant, however, was to retain any unexpended balance that might remain after making all the other payments specified, not for its own use but for a definite purpose clearly specified. It was to retain it "to be applied in paying the cost of extensions or improvements so far as it may find the same necessary." "To be applied" are the controlling words in this controversy. They govern the disposition of all the final residue. They fasten upon the entire "unexpended balance," however large it may be, and hold it so as to leave no ground for the contention that one party can keep as its own what both parties agreed should be applied in paying the cost of improving the property in which both were interested. The defendant was made the custodian of the residuum simply for the purpose of applying it to the object mentioned. It had no right to keep the money for itself, but it had the right in its sound discretion to expend it in improvements when necessary and it was the sole judge of the necessity so long as it acted in good faith. While the balance did not belong to the defendant, it had the power to hold it and use it to benefit the plaintiff's property and for no other purpose. If all should be thus used the plaintiff would have the benefit of it in the increased value of its property and while it could derive no immediate benefit from it its stockholders might through appreciation in the value of their stock. All improvements and extensions belong to it as fast as they are made and at the end of the fifty years of corporate life its stockholders will have the benefit thereof upon sale or

reorganization. If, however, all the balance is not thus expended it will necessarily belong to the plaintiff at the close of the corporate period when the stockholders will come into full enjoyment. The title to the balance conclusively appears from the fact that if expended in improvements as directed, such improvements will belong to the plaintiff and upon the expiration of the charter to its stockholders. If not so expended, it will not belong to the defendant but will stand in the place of the improvements into which it might have been converted, as the exclusive property of the plaintiff, or its stockholders.

The defendant expended but little of the balance in extensions and improvements, and in the nature of things more will be required in the future, as the road gradually wears out and needs reconstruction. The balance, already a large sum, is increasing by several thousand dollars each year, and the referee was of the opinion that the sum of $15,000 out of that already on hand, together with the annual accumulations, would be sufficient to take care of the future. This involved a question of fact, and as the Appellate Division reversed that determination we cannot interfere with their conclusion in that regard (139 App. Div. 542, 551). A new trial is, therefore, necessary, for the plaintiff had a right to an accounting in any event, and hence the complaint should not have been dismissed. Upon the new trial it may be found as a fact that all of the residuum, including interest, for the defendant did not invest the fund, but used it for its own purposes, will be needed for necessary extensions and improvements. In that event the plaintiff, although entitled to the accounting, will not be entitled to recover any part of the surplus in this action. If, however, it should be found as a fact that even upon the most liberal estimate all the remainder will not be needed for extensions and improvements, I think the plaintiff will be entitled to judgment for the part not so needed, with the right to pay it out in dividends to its stockholders. The limitation to a dividend of "not to exceed five per cent" does not extend to an unexpended balance

remaining after every payment has been made, all necessary improvements paid for and a safe allowance made for the future.

As the Appellate Division had the right to reverse the judgment of the referee on the facts, its judgment to. that extent should be affirmed, but as it had no right to dismiss the complaint, its judgment in that respect should be reversed and a new trial ordered, with costs to abide the event.

WILLARD BARTLETT, HISCOCK and COLLIN, JJ., concur with HAIGHT, J.; CULLEN, Ch. J., concurs with VANN, J.; GRAY, J., not sitting.

Judgment reversed, etc.