OPINION OF THE COURT
Bernard J. Fried, J.
Defendants have moved to compel plaintiff Andrew Z. Tong to arbitrate his discrimination claims under an arbitration clause in an agreement he signed upon beginning his employment at defendant S.A.C. Capital Management, LLC (SAC), and to stay litigation pending the arbitration, pursuant to CPLR 2201, 7501 and 7503. For the reasons that follow, I grant defendants’ motion and stay the action pending the outcome of arbitration.
Tong’s allegations are based on events that took place while Tong was recruited for employment as an analyst/trader for defendants from August 2005 until his termination, which became effective on April 10, 2006. Defendants do not dispute the facts as alleged by plaintiff for purposes of this motion.
According to documents submitted by plaintiff, Tong is a 37-year-old, married, Chinese man. Between 1992 and 1994, Tong pursued a Ph.D. in computer science at Columbia University. In 1994, he took a leave of absence for family reasons, after receiving his Master’s degree. Tong went to work at Bear Stearns, and later at Fuji Bank. (Notice and omnibus cross motion, exhibit S.) In this capacity, Tong worked in financial risk management and gave presentations in Virginia, New York, and Canada about artificial intelligence, which were related to his graduate work in computer science.
*403 Tong first met defendant Ping Jiang in 1998, when they were both working in the emerging markets department of Lehman Brothers, Inc. Jiang was Tong’s professional reference when Tong left Lehman in 2001 to join Stark Investments, Inc., in Mequon, Wisconsin. Over the next four years, the two men stayed in touch and occasionally socialized.
In early 2005, Jiang telephoned Tong and told him that he had taken a job at a private asset management firm called SAC and would like Tong to join his emerging markets macro trading group there. Between May and early July of 2005, Tong spoke to Jiang and expressed his interest in joining him at SAC. In early-to-mid-July, Jiang told Tong over the phone that he was offering him a job that would include a minimum salary of at least $250,000, and could shortly become considerably more profitable. Jiang told Tong that he would be trading stock indexes, currencies, and interest rates. Tong accepted the job offer over the phone soon afterward. Jiang then told Tong that he would have to demonstrate his commitment to Jiang and SAC by resigning from his current position and moving to New York as soon as possible. Tong complied and made a trip to New York. On July 24, Tong met with Jiang both alone and with other members of Jiang’s group. Jiang told Tong about his top secret training philosophy, which was to include a program of strict confidentiality and the elimination of Tong’s alleged personality flaws by requiring him to wear certain kinds of clothing at work.
In mid-August 2005, when Tong had still not received a formal job offer, Jiang asked Tong to come to New York permanently and begin work. Tong arrived in New York on August 18, 2005 and reported to Jiang for work the next day. On August 19, Jiang showed Tong a faxed copy of an offer letter from SAC; his employment was officially to begin on September 1, 2005. Unofficially, Tong began work immediately.
On August 26, Tong was given SAC’s statement of policies and code of ethics and conduct and an offer letter offering him a position as analyst/trader. The letter states that it is “also contingent upon ... (3) your signing an agreement Regarding Conditions of Employment, which includes an arbitration agreement.” (Offer letter at 3.) Tong was also given the “Agreement Regarding Conditions of Employment,” which was a contract dated August 17, 2005 between himself and SAC.
The agreement states: “WHEREAS, as a condition of employment with [SAC], [plaintiff] ha[s] agreed to accept the terms and conditions set forth herein.” (Kheel affidavit I, exhibit C at
*404 1.) Among its conditions, the agreement provides that Tong would not disclose any of SAC’s confidential information during or after his employment. (Id. 11 2.2.) This information was defined to include any “information relating to the business and personal affairs of” any of the principals and employees of SAC. (Id. If 1.) The agreement also provides that Tong “shall not, without SAC Capital’s prior written consent, discuss with the media (which includes any national or local newspaper, magazine, radio and/or television station) any matter related to SAC.” (Id. If 3.4 [a].) It further provides that Tong “agree[s] to act in good faith so as not to harm the business reputation of SAC in any way, which includes ... a promise [not to] defame or publicly criticize the services, business, integrity, veracity or reputation of SAC or its employees in either a professional or personal manner.” (Id. If 3.4 [b].)
In a provision entitled “Arbitration,” the agreement states in capital letters:
“EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE PARTIES AGREE THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE INTERPRETATION THEREOF, AND/OR THE EMPLOYMENT RELATIONSHIP SHALL BE SETTLED BY ARBITRATION IN ACCORDANCE WITH THE RULES, THEN IN EFFECT, OF THE AMERICAN ARBITRATION ASSOCIATION COMMERCIAL ARBITRATION RULES.[1]” (Id. 11 6.)
The agreement is to “be governed by the laws of the State of New York.” (Id. K 7.2.)
Before signing the agreement, Tong asked Jiang about the arbitration provision. Jiang said to him dismissively that it was “standard language,” that Tong could not get fired no matter what, and that he would be paid for two years. (Tong affidavit 11 37.) Jiang assured Tong that he was well protected in the terms of his employment package. Tong signed the documents because he regarded Jiang as his mentor and he believed and relied upon him.
After signing the offer letter, the agreement, and other related personnel documents, Tong went back to Wisconsin on September 2, 2005 to finish packing. Tong returned to New York on September 7, 2005 and moved into his new apartment near the offices of SAC. On September 9, 2005, Tong reported back to Jiang, ready for work.
*405 From the fall of 2005 until his termination by SAC, which became effective on April 10, 2006, Tong was allegedly subjected to sexual harassment, a hostile work environment, discrimination, and retaliation by defendants.
In November 2006, plaintiff forwarded defendants a draft complaint to facilitate settlement discussions. The parties explored settlement, pursuant to an informal agreement and later a formal standstill agreement, according to which the parties agreed not to begin litigation before January 11, 2007. When that agreement expired, in January 2007, plaintiff served on defendants a summons with notice, which was followed on March 7, 2007 by a complaint.
Plaintiffs complaint alleges discrimination (quid pro quo and hostile work environment), harassment, and retaliation, by all defendants, based on his gender, sex, sexual orientation, race, and national origin, under the New York State Human Rights Law (Executive Law § 296 [6]) and the New York City Human Rights Law (Administrative Code of City of NY § 8-107 [6]). Plaintiff also has brought common-law causes of action for breach of contract, promissory estoppel, fraudulent inducement, defamation, and intentional torts, based on the same alleged conduct.
Defendants brought this motion to compel ex parte on January 16, 2007 asking me to compel arbitration of this dispute and to issue “an interim stay of this and any other action from now until this motion to compel arbitration and stay litigation is heard and determined.” (Defendants’ mem[2] at 6.) At the temporary restraining order (TRO) hearing the following day, on January 17, both plaintiff and defendants appeared by counsel. A sketch artist asked permission to sit in the jury box and proceeded to sketch the proceedings. Counsel informed me that members of the press were present in the courtroom for the argument.
Defendants’ counsel asked me to seal the record or issue a confidentiality order pending my decision regarding the motion to compel and for an interim stay. (Transcript, Jan. 17, 2007, at 5.) Defendants’ counsel argued that the agreement’s confidentiality provisions, particularly paragraph 3.4, would be “rendered ineffectual” if the court files were not sealed, pending the decision on the motion to compel. (Transcript, Jan. 17, 2007, at 15.) Plaintiff opposed this request.
*406 Under the circumstances, I found good cause to order the records in this action sealed pursuant to section 216.1 of the Uniform Rules for Trial Courts (22 NYCRR), based on the likelihood of public disclosure of the salacious and yet-unproven allegations against defendants, in violation of the confidentiality provisions in the agreement signed by plaintiff. (Transcript, Jan. 17, 2007, at 13, 21-22.) I issued a written sealing order dated January 17, 2007 incorporating my decision on the record. I also denied defendants’ motion for a TRO staying the underlying action. (Transcript, Jan. 17, 2007, at 22, 24-25.)
On February 7, 2007, Tong filed opposition papers and cross-moved for several forms of relief: (a) a jury trial on arbitrability under CPLR 7503 (a); (b) severance of nonarbitrable issues for trial; (c) default judgment in part on liability under CPLR 3215 (a); (d) compelling three individuals to submit to depositions/ examinations before trial pursuant to CPLR 3106 (a); (e) compelling other witnesses under defendants’ control to submit to discovery under CPLR 3124; and (f) leave to renew and reargue my decision on January 17, 2007 sealing the court file, under CPLR 2221 (d), (e) and Uniform Rules for Trial Courts (22 NYCRR) § 216.1. Replies were filed by both sides. Oral argument on these motions took place on February 27, 2007. At this point, plaintiff had not yet filed his complaint. Counsel informed me that members of the press again were present in the courtroom. I declined to seal the courtroom but instructed the parties not to discuss plaintiff’s underlying allegations of discrimination.
Based on the oral argument and my review of the fully submitted papers, I issued an order dated March 21, 2007 granting defendants’ application to postpone the filing of their answer until after the issuance of my decision on the motion to compel. Plaintiffs counsel made an informal request for leave to reargue that order, which was argued in court on April 12 and denied by order dated April 23, 2007.
A written agreement to arbitrate is enforceable under New York law. (CPLR 7501.) A court may issue an order compelling arbitration upon application by a party aggrieved by another party’s failure to arbitrate. Such an order “shall operate to stay a pending or subsequent action, or so much of it as is referable to arbitration.” (CPLR 7503 [a].) Arbitration is a favored means of resolving disputes. (Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Am., 37 NY2d 91, 95 [1975].) “ ‘Where there is no substantial question whether a valid agreement was made or complied with . . . the court shall direct the parties to *407 arbitrate.’ ” (Liberty Mgt. & Constr. v Fifth Ave. & Sixty-Sixth St. Corp., 208 AD2d 73, 77 [1st Dept 1995], quoting CPLR 7503 [a].) “Thus, it is for the courts to determine, in the first instance, whether the parties have entered into a binding agreement to arbitrate.” (Id.) The “judicial inquiry ends once it is determined that a valid agreement to arbitrate exists and that the matter in controversy falls within the scope of the agreement.” (Id. at 80.)
Since Tong does not contest that he signed the arbitration agreement at issue, the only questions before me are: first, whether the arbitration agreement signed by Tong is broad enough to cover the dispute, and, second, whether it is valid and enforceable.
“A broad arbitration clause should be given the full effect of its wording in order to implement the intention of the parties.” (Matter of Weinrott[Carp], 32 NY2d 190, 199 [1973] [“As a general rule, . . . under a broad arbitration provision the claim of fraud in the inducement should be determined by arbitrators”].) A court’s job is to
“perform the initial screening process designed to determine in general terms whether the parties have agreed that the subject matter under dispute should be submitted to arbitration. Once it appears that there is, or is not[,] a reasonable relationship between the subject matter of the dispute and the general subject matter of the underlying contract, the court’s inquiry is ended.” (Nationwide Gen., 37 NY2d at 96.)
In Matter of Howard & Co. v Daley (27 NY2d 285 [1970]), for instance, where the arbitration clause covered “any dispute” concerning the employment agreement or “any term or condition of employment,” the Court held that claims challenging the “termination of the employer-employee relationship” and the “question of severance pay” were “well within the meaning of’ the clause. (Id. at 287, 292; see also Alsy Corp. v Gindel, 197 AD2d 492, 492-493 [1st Dept 1993] [finding reasonable relationship between broad arbitration provision covering “any dispute or disagreement arising out of or in connection with” termination agreements and claims concerning petitioner’s alleged obligation to indemnify respondents for expenses incurred in another lawsuit].)
In the agreement, the parties agreed “that any dispute or controversy arising out of or relating to this agreement, the in *408 terpretation thereof, and/or the employment relationship [between Tong and SAC] shall be settled by arbitration.” Plaintiff has charged defendants with discrimination, harassment, and retaliation in his employment, as well as breach of contract, promissory estoppel, fraudulent inducement, defamation, and intentional torts — all arising out of the same alleged conduct. The arbitration provision is unambiguous and is plainly broad enough to cover plaintiffs claims.
Plaintiff has also raised various — mostly frivolous — arguments in support of the assertion that the arbitration clause does not actually cover his statutory employment claims. The only argument worth mentioning is the argument concerning plaintiffs punitive damages claim. Plaintiff asserts that this action cannot be sent to arbitration, because he cannot get punitive damages in arbitration under New York law, and his punitive damages claim will be the lion’s share of the relief he seeks. Defendants have not responded to this argument.
The American Arbitration Association (AAA) Commercial Arbitration Rules say nothing about whether punitive damages may be awarded — they do not carry a presumption either way. They provide simply that “[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties.” (AAA Commercial Arbitration Rules rule R-43 [a].)
New York law does not permit arbitrators to award punitive damages. (Garrity v Lyle Stuart, Inc., 40 NY2d 354, 356 [1976].) However, the United States Supreme Court held in Mastrobuono v Shearson Lehman Hutton, Inc. (514 US 52 [1995]) that the Federal Arbitration Act (FAA) preempts the Garrity rule for an arbitration agreement governed by the FAA, even when the agreement contains a New York choice of law clause, in the absence of evidence that the parties intended to give up their right to punitive damages.
New York courts have followed Mastrobuono. (E.g. Matter of Americorp Sec. v Sager, 239 AD2d 115, 116 [1st Dept 1997] [reversing stay of arbitration of punitive damages claim, concluding that parties’ agreement that their “right and liabilities” would be governed by New York law did not invoke New York’s restrictions on arbitral awards of punitive damages, where parties agreed to submit dispute to arbitration at National Association of Securities Dealers (NASD), whose rules permit punitive damages awards]; Merrill Lynch, Pierce, Fenner & Smith v Adler, 234 AD2d 139, 139 [1st Dept 1996] [reversing *409 stay of arbitration as to punitive damage claim, where arbitration agreement selected NASD as arbitral forum, and NASD rules contemplated “a broad range of relief”]; Matter of Prudential Sec. [Pesce], 168 Misc 2d 699 [Sup Ct, NY County 1996, Cahn, J.] [denying motion to stay arbitration as to punitive damages claim]; Matter of Cohen v S.A.C. Capital Advisors, LLC, 11 Misc 3d 1054[A], 2006 NY Slip Op 50205[U] [Sup Ct, NY County 2006] [enforcing arbitral award of punitive damages, concluding that New York choice of law provision did not displace FAA].)
The FAA provides that an arbitration provision in “a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” (9 USC § 2.) The “transaction involving commerce” provision has been interpreted as broadly as Congress’ Commerce Clause power to encompass a wider range of transactions than those actually within the flow of interstate commerce. (Citizens Bank v Alafabco, Inc., 539 US 52, 56 [2003] [concluding that debt-restructuring agreement involved commerce, given broad impact of commercial lending on national economy, the use of out-of-state parts and raw materials, and other factors].)
It is evident that Tong’s agreement with SAC involves “commerce” under the FAA. While still a Wisconsin resident, Tong was recruited and then hired to work as a trader in SAC’s emerging markets macro trading group in New York, where he would be trading stock indexes, currencies, and interest rates. Tong’s job — the subject of the agreement — plainly concerns a “transaction involving commerce” under section 2 of the FAA. (See also Matter of Cohen v S.A.C. Capital Advisors, LLC, 11 Misc 3d 1054[A], 2006 NY Slip Op 50205[U] [Sup Ct, NY County 2006] [concluding that agreement with SAC containing identical arbitration provision was a “transaction involving commerce” under FAA].)
Consequently, I conclude that Tong’s punitive damages claim is arbitrable under the agreement. I therefore reject plaintiffs argument that his punitive damages claim entitles him to avoid arbitration.
I now turn to the crustier issue of whether the agreement is valid.
The FAA provides that an arbitration provision in “a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at *410 law or in equity for the revocation of any contract.” (9 USC § 2.) Under CPLR 7503, a party may resist enforcement of an agreement to arbitrate on any basis that could provide a defense to or grounds for the revocation of any contract, including fraud and duress. The question is: who — a court or an arbitrator— decides whether revocation is warranted? The court “must decide the challenge where it is to the validity of the arbitration clause itself, or where the alleged illegality permeates the contract as a whole.” (Matter of Teleserve Sys. [MCI Telecom. Corp.], 230 AD2d 585, 592-593 [4th Dept 1997].) But “courts look only to whether the arbitration clause itself was induced by fraud or duress; the question of whether the overall agreement is invalid is for the arbitrators” to decide. (Zurich Ins. Co. v R. Elec., 5 AD3d 338, 339 [1st Dept 2004].) If a court concludes, however, that “the alleged fraud was part of a grand scheme that permeated the entire contract, including the arbitration provision, the arbitration provision should fall with the rest of the contract.” (Matter of Weinrott [Carp], 32 NY2d 190, 197 [1973]; Matter of Kennedy v Mobius Realty Holdings LLC, 33 AD3d 380, 382-383 [1st Dept 2006].)
In his written submissions, plaintiff has claimed that the arbitration clause is invalid because of fraud, duress, coercion, and adhesion both specific to the arbitration provision and permeating the agreement as a whole.
The essential elements to establish a case for fraud are “representation of a material existing fact, falsity, scienter, deception and injury.” (New York Univ. v Continental Ins. Co., 87 NY2d 308, 318 [1995] [emphasis and internal quotation marks omitted].) “[D]uress is a species of fraud in which compulsion in some form takes the place of deception in accomplishing an injury.” (Candid Prods. v SFM Media Serv. Corp., 51 AD2d 943, 944 [1st Dept 1976].) To establish duress, a party needs to show “actual or threatened violence or restraint contrary to law.” (Id.) New York appellate courts do not distinguish between duress and coercion as torts. (See, e.g., Paull v First UNUM Life Ins. Co., 295 AD2d 982, 983 [4th Dept 2002]; Matter of Wilson v Jackson, 161 AD2d 652, 653 [2d Dept 1990]; Perl v Perl, 126 AD2d 91, 93-94 [1st Dept 1987].) Inasmuch as coercion is a tort distinct from duress, however, it also requires as an element that the defendant have acted illegally. (Grandonico v Consortium Communications Intl., Inc., 566 F Supp 1288, 1293 [SD NY 1983].) A claim that an agreement is unenforceable as an adhesion contract requires a showing that “the party seeking to *411 enforce the contract has used high pressure tactics or deceptive language in the contract and [that] there is inequality of bargaining power between the parties.” (Morris v Snappy Car Rental, 84 NY2d 21, 30 [1994] [internal quotation marks omitted].)
According to plaintiffs submissions, however, the great majority of the illegal conduct allegedly occurred during the eight months after Tong signed the agreement. Plaintiffs characterizations of defendants’ conduct after Tong signed the agreement may or may not be justified by the evidence — it is not for me to decide at this point. My job in deciding this motion is to determine, after peeling away the rhetoric, whether the factual allegations leading up to and including the execution of the agreement warrant the conclusion that the arbitration clause is invalid.
Tong has alleged that he quit his job in Wisconsin and flew to New York on the strength of an oral job offer from Jiang, which sounded attractive in part because the job was in New York and would pay a lot of money. Tong has alleged that, at this meeting in New York, Jiang explained his training philosophy and told Tong that he would be expected to submit to a top secret training program as described supra. A week after learning this information, Tong was shown the agreement, which contained the arbitration clause. Tong has alleged that Jiang told him to sign the agreement, containing the arbitration provision, that he used dismissive language to characterize its contents, and that he said nothing to clarify what rights Tong was giving up in the arbitration provision. Tong signed the agreement, proceeded to move his family from Wisconsin to New York, and reported for work for Jiang at SAC shortly afterward.
Tong says that he signed the agreement because he trusted Jiang and because Jiang was his mentor. Tong has a Master’s degree from Columbia University, has lived and worked in the United States since 1994, and was at least 35 years old at the time of the alleged misconduct by Jiang. Tong has not alleged Jiang falsely represented a material fact about the agreement with scienter, and that Tong was deceived and injured by that misrepresentation. Tong has not alleged that he was under any threat or compulsion by physical force or other unlawful restraint to sign the agreement. Tong has not alleged that he was unable to understand the agreement or that he did not read it. Tong has not alleged that he had unequal bargaining power in comparison with Jiang, or that he was deprived of his right to *412 refuse to sign the documents. Tong always had the option to walk away from the job offer. In summary, notwithstanding the strong language of his written submissions, Tong has not alleged specific conduct that substantiates his characterizations of fraud, duress, coercion, or adhesion in the execution of the agreement.
The cases cited by Tong in support of his arguments are distinguishable. (E.g. Kennelly, 33 AD3d at 382-383 [concluding that petitioner had raised threshold issues regarding the validity of the agreement based on affidavit that sufficiently detailed circumstances of fraud]; Housekeeper v Lourie, 39 AD2d 280, 285 [1st Dept 1972] [ordering factual hearing to resolve factual dispute as to whether arbitration agreement was invalid due to fraud, where petitioners had made prima facie showing of fraud].)
Finally, plaintiff has not raised any valid objection as to why the agreement should not bind Jiang as an employee of SAC, and S.A.C. Capital Advisors, LLC, as an affiliated entity of SAC. (See Hirschfeld Prods. v Mirvish, 88 NY2d 1054, 1056 [1996]; Roby v Corporation of Lloyd’s, 996 F2d 1353, 1360 [2d Cir 1993].)
In conclusion, the arbitration provision is valid and covers plaintiffs alleged claims.
Plaintiff has also cross-moved for a default judgment against defendants on the grounds that they failed to appear in this action or make a timely demand for a complaint in lieu of answer. I reject this request; by actively litigating and submitting fully to the jurisdiction of the court, defendants have made at least an informal appearance in this action. (See Taylor v Taylor, 64 AD2d 592, 592 [1st Dept 1978].) None of the cases cited by plaintiff require a different result.
Plaintiff also asserts that I am prevented by law of the case doctrine from reversing my January 17 decision not to stay the underlying action. This is incorrect; I am permitted by law to “grant a stay of proceedings in a proper case, upon such terms as may be just.” (CPLR 2201.) My decision to stay litigation after hearing argument on defendants’ motion to compel arbitration was just and proper.
Plaintiff’s cross motion is also denied as to his request to renew and reargue the sealing order.
A motion for leave to reargue “shall be based upon matters of fact or law allegedly overlooked or misapprehended by the court *413 in determining the prior motion, but shall not include any matters of fact not offered on the prior motion.” (CPLR 2221 [d] [2].) A motion to renew requires “new facts not offered on the prior motion that would change the prior determination or shall demonstrate that there has been a change in the law that would change the prior determination.” (CPLR 2221 [e] [2].) Plaintiff has offered no new facts or law in support of his motion, but, even if he had, I would deny this request.
The Uniform Rules for Trial Courts provide that a court may seal court records in a proceeding only upon good cause, which shall include “the interests of the public as well as of the parties.” (22 NYCRR 216.1 [a].) This provision “amounts to nothing more than a legislative recognition that a sealing order should clearly be predicated upon a sound basis or legitimate need to take judicial action.” (Gryphon Dom. VI, LLC v APP Intl. Fin. Co., B.V., 28 AD 3d 322, 325 [1st Dept 2006].) “[L]itigants ought not be required to wash their dirty linen in public and subjected to public revelation of embarrassing material where no substantial public interest is shown and where the material may have been inserted into court documents for the sole purpose of extracting a settlement of the action.” (Feffer v Goodkind, Wechsler, Labaton & Rudoff, 152 Misc 2d 812, 815-816 [Sup Ct, NY County 1991], affd 183 AD2d 678 [1st Dept 1992] [sealing records of all proceedings, where “the matter properly belong(ed) in arbitration” and the material sought to be sealed for the most part was “of minimal public interest”].)
Under the circumstances — in light of the embarrassing allegations in plaintiffs complaint, the minimal public interest in these allegations, the agreement’s confidentiality provisions, and the merits of the motion to compel arbitration — I had good cause to enter the sealing order.[3]
Because Tong’s claims must be submitted to arbitration, this action shall be stayed pending the outcome of arbitration, pursuant to CPLR 7503 (a). In light of my decision granting the motion to compel arbitration as a matter of law, plaintiffs request for severance of claims, discovery, and an immediate trial is denied as moot. Plaintiffs other arguments have been considered and rejected.
*414 Accordingly, it is ordered that defendants’ motion to compel arbitration and to stay litigation is granted; and it is further ordered that Tong shall arbitrate his claims in accordance with the terms of the agreement; and it is further ordered that the action is stayed pending the outcome of arbitration.

1. I will refer to this provision as the “arbitration clause.”

. Memorandum of law in support of order to show cause to compel arbitration and to stay litigation, Jem. 16, 2007.

. I also reject plaintiffs assertion that I misapplied CPLR 7502 (c) in sealing the court file, because the sealing order was not based on section 7502 (c).