Filed 9/16/10          NOS. 4-10-0002, 4-10-0003 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

SHAHID R. KHAN; ANN C. KHAN; SRK WILSHIRE ) Appeal from
INVESTMENTS, LLC; SRK WILSHIRE PARTNERS; ) Circuit Court of
SRK WILSHIRE INVESTORS, INC.; ) Champaign County
THERMOSPHERE FX PARTNERS, LLC; and ) No. 09L140
KPASA, LLC, )
     Plaintiffs-Appellants, )
     v.  (No. 4-10-0002) )
BDO SEIDMAN, LLP; PAUL SHANBROM; )
MICHAEL COLLINS; DEUTSCHE BANK AG; )
DEUTSCHE BANK SECURITIES, INC., d/b/a )
DEUTSCHE BANK; ALEX BROWN; DAVID PARSE; )
EQUILIBRIUM CURRENCY TRADING, LLC; )
SAMYAK VEERA; GRANT THORNTON, LLP; )
GRAMERCY ADVISORS, LLC; JAY A. JOHNSTON; )
and MARC HELIE, )
     Defendants-Appellees. )
-------------------------------------------------------------- )
SHAHID R. KHAN; ANN C. KHAN; UVIADO, LLC; ) No. 09L139
JONCTION, LLC; and LEMAN, LLC, )
     Plaintiffs-Appellants, )
     v.  (No. 4-10-0003) )
BDO SEIDMAN, LLP; PAUL SHANBROM; )
MICHAEL COLLINS; GRAMERCY ADVISORS, LLC; )
GRAMERCY ASSET MANAGEMENT, LLC; )
GRAMERCY FINANCIAL SERVICES, LLC; TALL )
SHIPS CAPITAL MANAGEMENT, LLC; JAY A. )
JOHNSTON; MARC HELIE; DECASTRO, WEST, )
CHODOROW, GLICKFELD AND NASS, INC.; and ) Honorable
FINANCIAL STRATEGY GROUP, PLC, ) Jeffrey B. Ford,
     Defendants-Appellees. ) Judge Presiding.

JUSTICE APPLETON delivered the opinion of the court:

In these two consolidated cases, Champaign County case Nos. 09-L-139 and

09-L-140 (Nos. 4-10-0003 and 4-10-0002, respectively, on appeal), plaintiffs are Shahid

R. Khan and his wife, Ann C. Khan, along with various business entities that the Khans formed, on the advice of their accountants at BDO Seidman, LLP (BDO), for the purpose of shuffling assets around and generating artificial tax losses. The Khans did not know, however, that they were doing anything illegal. BDO had been their accounting firm for years, and it sold them on the so-called "investment strategies" as legitimate ways to make a profit and at the same time to minimize income taxes. And to be doubly safe, the Khans went to supposedly independent law firms recommended by BDO, namely, Jenkens & Gilchrist, P.C. (Jenkens); Proskauer Rose, L.L.P. (Proskauer); and DeCastro, West, Chodorow, Glickfeld & Nass, Inc. (DeCastro), which gave the Khans opinion letters reassuring them that they could claim the losses in their income-tax returns; but the opinion letters were worthless because these law firms were in cahoots with BDO, so plaintiffs allege.

The upshot is that the Khans lost a lot of money, not only the fees and premiums they paid to defendants to carry out the "investment strategies," but also the back taxes, interest, and penalties they had to pay to the Internal Revenue Service (IRS) when it disallowed the claimed losses. All this is according to the complaints, in which the Khans sue BDO and two of its employees, Paul Shanbrom and Michael Collins, along with a variety of alleged coconspirators that helped with the sham investments and other transactions necessary to the creation of the abusive tax shelters.

Pursuant to sections 2-619(a)(1) and (a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(1), (a)(9) (West 2008)), BDO, Collins, and Shanbrom moved either to dismiss the complaints or to stay the actions, on the ground that the Khans and BDO had entered into an arbitration agreement that encompassed plaintiffs' claims. The

trial court granted the BDO defendants' motion to compel arbitration in the two cases, holding that all of the claims came within the scope of the arbitration clause.

Plaintiffs appeal from this ruling on a number of grounds, and we agree with one of their arguments, namely, that the arbitration agreement does not cover the claims that plaintiffs assert in their complaints. Or, more precisely, it does not cover all of the claims. The only claims we find to be subject to arbitration are those for breach of contract, which plaintiffs plead in the alternative. We find no evidence, in the text of the contract, that plaintiffs ever agreed to arbitrate the other claims, such as those for breach of fiduciary duty, negligent misrepresentation, fraud, and civil conspiracy.

According to the contractual language, a claim is subject to arbitration only if it relates to, or arises from, BDO's "performance" of the contract. (Actually, there are several contracts, called "consulting agreements," but they are identical in their germane provisions.) In the complaints in the two cases, plaintiffs frame their claims in a variety of legal theories, but when one reduces the claims to their essence, they mostly relate to tasks that the consulting agreements expressly exclude from BDO's promised performance. Essentially, in both cases, plaintiffs sue the BDO defendants for harming them financially in three ways: (1) giving them dishonest investment advice, (2) preparing defective income-tax returns for them, and (3) conspiring with law firms to issue bogus opinion letters attesting to the legality of losses claimed in the tax returns. The second item folds into the third item because, according to the consulting agreements, the client is supposed to confirm the correctness of the tax returns by conferring with a law firm and, in fact, the consulting agreements make clear that although BDO will prepare the client's tax returns, BDO will not thereby offer any legal opinions or tax opinions and that the client should not

understand BDO as doing so. The consulting agreements disavow not only legal opinions but also "investment advice" as being part of BDO's performance. It follows that only the alternative counts for breach of contract, or failure to perform, fall within the scope of the arbitration clause. Therefore, we affirm the trial court's judgments in part, reverse them in part, and remand these two cases for further proceedings.

I. BACKGROUND

A. Case No. 09-L-140

1. The 1999 Digital Options Strategy

a. BDO Promotes the Digital Options Strategy to Shahid Kahn

Beginning in approximately 1993, BDO performed auditing services for Chromecraft, a company of which Shahid Khan was part owner. Michael Collins, a partner at BDO, was in charge of auditing services for Chromecraft, and by 1999, he had been one of Khan's trusted accountants and advisors for some six years.

In 1999, Khan requested his own partner at Chromecraft to ask Collins if he knew anyone who could advise him on purchasing foreign currency. Khan needed foreign currency because he was in negotiations to purchase a Canadian company that manufactured plastic automobile bumpers and the Japanese owners of the company wanted to be paid in Japanese yen.

Collins referred Khan to Paul Shanbrom, who was a member of BDO's Tax Solutions Group and reputedly an expert in foreign-currency trading, and in September 1999, Khan and one of his estate-planning advisors had a meeting with Collins and Shanbrom. The meeting went beyond the subject of simply purchasing foreign currency. Shanbrom introduced Khan to an "investment strategy" involving the purchase and sale of

- 4 -

digital options on foreign currency (the Digital Options Strategy), a strategy which, according to Shanbrom, not only gave Khan a chance to double his money but which also allowed him to claim a tax loss if he lost money on his investments in foreign currency.

When someone buys an option, that person buys the right, but not the obligation, to buy or sell a given quantity of assets (in this case, foreign currency) at a fixed price, or "strike price," within a specified time, regardless of the market price, or "spot price," of the assets. An option is "digital," or "binary," if the investor stands to win or lose a predetermined amount in full: in other words, the payout will be all of the predetermined amount or nothing (1 or 0, in binary terms). Essentially, a digital option is an all-or-nothing wager that the spot price will be at or above a given price on a certain date--or it can be an all-or-nothing wager that the spot price will be beneath the given price on that date.

If the investor is betting that the spot rate will be at or above the given price on a certain date, the investor has a long option. On the other hand, if the investor is betting that the spot rate will be at or below the given price on a certain date, the investor has a short option.

b. The Consulting Agreement of November 12, 1999

On November 12, 1999, BDO and Flex-N-Gate Corporation, of which Shahid Khan was president, entered into a contract entitled "Consulting Agreement," and this contract contained an arbitration clause. (We learn the details of the consulting agreements from BDO's motion for dismissal, to which the consulting agreements are attached as exhibits; the rest of the information in Part I of this order comes from plaintiffs' complaint.) The arbitration clause embraces all claims arising in connection with the performance or breach of the consulting agreement; and in the parts of the agreement defining BDO's

performance, certain clauses limit or qualify other clauses. On the one hand, BDO will provide consulting services in conjunction with the buying and selling of investments, but, on the other hand, BDO will provide no "investment advice or services." Similarly, on the one hand, BDO will help with structuring investment transactions so as to achieve the most beneficial tax results and will prepare the client's income-tax returns, but, on the other hand, legal opinions or tax opinions are not part of BDO's agreed-on performance.

The consulting agreement reads as follows:

"WHEREAS, the Client is interested in selling various investments and in making certain other investments ('the Transactions');

WHEREAS, BDO is in the business of providing accounting and consulting services; and

WHEREAS, the Client desires BDO to provide certain Consulting Services in connection with the Transactions, and BDO desires to provide such services to the Client, all upon the terms and conditions herein.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Term. Unless earlier terminated as provided hereunder, the term of this Agreement shall commence on the Effective Date and continue through December 31, 2000 when this Agreement shall automatically expire (the 'Term').

2. <u>Services</u>.   During the Term [of the consulting agreement], BDO agrees to provide the following consulting services to the Client (the 'Services'):  consulting services in conjunction with Transactions, including assistance in determination of sales prices and allocations thereof, assistance in structuring the Transactions, assisting the Client and/or his advisors in structuring the Transactions to attain the most beneficial tax results, preparation of the 2000 and 2001 income tax returns for the Client and/or its shareholders, and assisting the Client and/or his representatives in its discussions and/or negotiations with potential purchasers or sellers, on a specifically requested basis, as well as in income and estate tax planning and other personal financial planning.  <u>BDO is not in the business of providing investment advice or services, thus, none of the services to be rendered are to be considered as investment advice, and it is understood that the Client is not relying upon BDO for investment advice or services.</u>

3. <u>Fees</u>.

(a) In consideration for the Services, the Client shall pay BDO the following fee: $1,580,000.00 (One Million Five Hundred Eighty Thousand dollars) (the 'Consulting Fee').

\*\*\*

- 7 -

\* \* \*

6. <u>No Warranty</u>. \*\*\* BDO's Services hereunder do not include, and BDO assumes no responsibility whatsoever for, any legal and/or tax opinions regarding any strategies that may be implemented, and has advised the Client to retain a law firm for legal and/or tax opinions on any strategies or transactions they enter into. \*\*\*

7. <u>Dispute Resolution</u>.

\* \* \*

(d) If any dispute, controversy or claim arises in connection with the performance or breach of this agreement and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of New York, and the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association ('AAA'), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in the city in which the BDO

office providing the relevant Service exists, unless the parties agree to a different locale.

* * *

10. Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of New York, except for its conflict of law principles.

* * *

12. Entire Agreement. This Agreement sets forth the entire agreement between the parties with respect to the subject matter herein, suspending all prior agreements, negotiations or understandings, whether oral or written, with respect to such subject matter. This Agreement may not be amended or modified except in writing signed by duly authorized representatives of the Client and BDO." (Emphases in original.)

Hence, in this fully integrated consulting agreement that can be modified only in a writing signed by both parties, the term "Transactions" means selling investments and making investments. BDO proposes providing consulting services to the client in connection with the Transactions, that is, in connection with the selling and making of investments. These consulting services include determining the sales price of investments, structuring the sale or making of investments, and negotiating with potential buyers or sellers of investments. Nevertheless, BDO will not provide "investment advice or services." Likewise, BDO will prepare the client's income-tax returns and will suggest how to structure

- 9 -

investment transactions so as to achieve the optimal tax outcome, but the client is advised to consult a law firm to confirm the correctness of BDO's tax analyses, and it is understood that BDO will offer no legal or tax opinions.

c. Implementation of the Digital Options Strategy

We now will describe the Digital Options Strategy as we understand it from the complaint. We might be slurring over some nuances, but the details or finer points of the strategy seem unimportant to this appeal. All that is necessary, at this point, is to have a general conception of the strategy so as to understand the nature of the various acts of wrongdoing of which plaintiffs accuse defendants in their complaint.

Roughly speaking, here is how the Digital Options Strategy worked. The Khans entered into a private contract with Deutsche Bank whereby the Khans, through SRK Wilshire Investments (Wilshire Investments), bought from Deutsche Bank a long option on foreign currency and sold to Deutsche Bank a short option. Thus, there came into existence an opposing pair of options, one long and the other short. These options were designed to cancel each other out. The strike prices of the two options were only a fraction of a penny apart, and the premium that the Khans paid Deutsche Bank for the long option, though large, was almost entirely offset by the premium Deutsche Bank agreed to pay the Khans for the short option (almost but not quite: the Khans paid a net premium to Deutsche Bank of $350,000, the difference between the $35 million that the Khans paid for the long option and the $34,650,000 that Deutsche Bank agreed to pay them for the short option). Because the strike prices of the opposing options were so close together and because Deutsche Bank had the contractual right to select the applicable spot rate from a range of currency rates, it was a virtual certainty that the transaction would be close to a

wash--Deutsche Bank would see to that.

So, pursuant to this scheme that was calculated to be a wash on the investment side (and, as we will explain, a capital loss on the tax side), the Khans formed the necessary business entities and transferred assets between them, all under the guidance of BDO. On November 17, 1999, the Khans formed Wilshire Investments and SRK Wilshire Partners (Wilshire Partners). On November 24, 1999, through Wilshire Investments, the Khans bought and sold the opposing options, which had expiration dates of December 23, 1999. On November 26, 1999, Wilshire Investments contributed its interest in the as of yet unexpired options to Wilshire Partners as a capital contribution. On December 10, 1999, Wilshire Partners purchased a quantity of Canadian dollars as an investment. On December 23, 1999, both the long option and the short option terminated "out of the money": they became worthless, based on the spot rate that Deutsche Bank chose. Of course, both the Khans and Deutsche Bank got to keep the premiums they had paid each other, but Deutsche Bank's premium was $350,000 greater than the premium it had paid to the Khans (or Wilshire Investments). On December 27, 1999, the Khans contributed their interest in Wilshire Partners to Wilshire Investments, causing the dissolution and liquidation of Wilshire Partners. As a distribution in liquidation of Wilshire Partners, all of the investments in foreign currency were distributed to Wilshire Investments.

Consequently, for tax purposes, the Khans' interest in Wilshire Investments had a basis equal to the amount they had paid to Deutsche Bank for the long option, but that amount was not offset as a result of the assumption by Wilshire Investments of the Khans' obligation to Deutsche Bank on the short option, apparently because the short option was only a contingent liability. (There are also corporate plaintiffs that have an

interest in this matter, but we are referring to them all as "the Khans," for simplicity's sake.) In other words, the long option counted for purposes of the basis the Khans had in Wilshire Investments, but the short option, which greatly reduced the economic significance of the long option, supposedly did not count. Upon the disposition of the Khans' partnership interest in Wilshire Investments, the expensive long option had expired "out of the money" and had lost all its value, so the Khans claimed a tax loss equal to the premium they had paid for the long option, even though (because of the offsetting short option) they did not really incur an economic loss in that amount.

d. The Legal Opinion From Jenkens on the 1999 Digital Options Strategy

Both Shanbrom and Collins assured Shahid R. Khan that the Digital Options Strategy was perfectly legal and that it would pass muster with the IRS. Nevertheless, Shanbrom told Khan that getting a legal opinion to that effect would be advisable before actually implementing the Digital Options Strategy and using it in his tax returns. This legal opinion, Shanbrom said, should come from an "independent" and reputable law firm with expertise and experience in the Digital Options Strategy. Such an opinion would provide Khan with "absolute penalty protection" from the IRS, Shanbrom said, and the law firm most qualified to issue this protective legal opinion was Jenkens.

Khan followed Shanbrom's recommendation and went to Jenkens, and on March 20, 2000, Jenkens issued to Khan an opinion letter confirming the legality of the 1999 Digital Options Strategy. The letter opined that plaintiffs' "basis in their interest in the Partnership after contribution of the Options [would] include the cost of the Long Option contributed, without adjustment for the Short Option." Jenkens further opined that "[t]he step transaction, sham transaction, and economic substance doctrines [would] not

apply to disallow the results of the transactions described herein." Further, IRS Notice 1999-59, which warned against transactions lacking economic substance and having no apparent purpose other than to generate a fake capital loss, was simply "'inapplicable to the transactions at issue here.'"

Little did plaintiffs know, however, that BDO had an arrangement with Jenkens. Not only Jenkens but another law firm to which BDO eventually would refer plaintiffs, Proskauer, had an agreement with BDO whereby BDO could promise prospective clients that they would receive legal opinions from Jenkens and Proskauer certifying the soundness and legality of the investment and tax strategies that BDO proposed, including the Digital Options Strategy. These legal opinions were not specifically tailored to the client's particular financial situation "but were merely 'fill in the blank' boilerplate opinions provided to Plaintiffs as part of a 'pre-wired' scheme." Nonetheless, Jenkens collected a substantial fee from the clients for these legal opinions. "In addition, Jenkens & BDO were involved in fee 'kickbacks' between themselves and with third parties who convinced clients to execute an Investment Strategy with Jenkens, Deutsche Bank, BDO, and others."

e. The Preparation and Filing of Plaintiffs' 1999 Income Tax Returns

After the publication of IRS Notice 1999-59 on December 27, 1999, BDO prepared and signed plaintiffs' 1999 federal and state income-tax returns. Specifically, on April 1, 2000, BDO signed the 1999 federal tax returns for Wilshire Investments and Wilshire Partners, and on April 1, 2000, BDO signed plaintiffs' 1999 federal individual tax returns. These tax returns contained the losses supposedly generated by the 1999 Digital Options Strategy. Advising plaintiffs that the tax returns were "properly prepared in accordance with professional standards," BDO recommended that plaintiffs add their

signatures to the returns and file them with the IRS. Plaintiffs did so, relying on the representations and assurances that defendants had made to them during the promotion, sale, and implementation of the 1999 Digital Options Strategy and also relying on the opinion letter from Jenkens. The filing of these returns was the final step of the 1999 Digital Options Strategy.

### f. The Publication of IRS Notice 2000-44

On August 11, 2000, before plaintiffs filed their 1999 individual federal tax returns, the IRS published IRS Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis" and describing transactions similar to those described in IRS Notice 1999-59-- transactions that "'purport[ed] to generate tax losses for taxpayers.'" One of the examples that IRS Notice 2000-44 gave closely resembled the Digital Options Strategy: the taxpayer purchased call options and simultaneously wrote (or sold) offsetting call options, transferred the option positions to a partnership, and claimed that his or her basis in the partnership interest was "'increased by the cost of the purchased call options but [was] not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation.'" The IRS warned that "'[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) [were] not allowable as deductions for Federal income tax purposes.'"

### g. The Tax Amnesty Program

In late 2001 and early 2002, the IRS offered the "Tax Amnesty Program," a program in which taxpayers who had participated in illegal tax-avoidance schemes such as the 1999 Digital Options Strategy could voluntarily come forward, disclose their

involvement, and thereby avoid any penalties for underpayment of taxes. The BDO defendants advised plaintiffs, however, not to participate in the amnesty program.

According to the complaint, it was for BDO's own benefit, rather than plaintiffs' benefit, that BDO steered plaintiffs away from the amnesty program. It was in BDO's interest to prevent any bad odors from escaping from its tax department. If plaintiffs had talked to the IRS, the IRS would have launched an investigation of BDO and would have required BDO to disclose the names of all of its clients who had used the Digital Options Strategy or anything similar to it.

h. The IRS Disallows the Loss Generated By the 1999 Digital Options Strategy

In 2008, the IRS determined that plaintiffs owed substantial back taxes, interest, and penalties as a direct result of their participation in the 1999 Digital Options Strategy. In addition to this liability to the IRS, plaintiffs lost the benefit of the fees and premiums they had paid in carrying out the 1999 Digital Options Strategy.

2. The 2000 COINS Strategy

a. Shanbrom Promotes the COINS Strategy to Khan

From their conversations, Shanbrom was aware of Shahid Khan's unhappiness that he had made no money on the foreign-currency market through the 1999 Digital Options Strategy (Khan did not understand that the options were specifically designed to expire "out of the money"). So, in approximately June 2000, Shanbrom told Khan that BDO had developed another investment strategy, one that offered a better chance of making a profit, whereupon he introduced Khan to the COINS Strategy. On the advice of BDO, Khan agreed to use this new moneymaking and tax-reducing strategy.

b. The Consulting Agreement of July 24, 2000

On July 24, 2000, Shahid Khan, in his capacity as president of Flex-N-Gate, Canada, ULC, entered into a "consulting agreement" with BDO. The provisions in this agreement were identical to those in the agreement dated November 13, 1999--including the arbitration clause--except that the term of this agreement was from July 24, 2000, to December 31, 2001, and the "consulting fee" was $5,400,000.

c. The Implementation of the COINS Strategy

The 2000 COINS Strategy was merely a variation on the 1999 Digital Options Strategy. On September 29, 2000, using Deutsche Bank as the counterparty, Wilshire Investments bought and sold offsetting pairs of options tied to foreign-currency exchange rates during specified periods in the future, with extremely close strike prices and a spot rate chosen by Deutsche Bank. The cost of the long option, though large, was mostly (but not entirely) offset by the premium Wilshire received on the sale of the short option. On October 18, 2000, pursuant to the instructions of BDO, Wilshire Investments made a capital contribution of these option positions to a partnership formed specifically for purposes of the 2000 COINS Strategy, Thermosphere FX Partners, L.L.C. (Thermosphere). Supposedly, the long option counted toward the basis, without any offset by the short option. On December 6 and 11, 2000, the strike prices on the opposing options were met, with the result that the gain on one option was, roughly speaking, matched by the loss on the other option. The options now were worthless, requiring an adjustment in plaintiffs' basis in Thermosphere. On December 15, 2000, Thermosphere purchased foreign currency. Plaintiffs requested to be redeemed out of Thermosphere, and on December 18, 2000, plaintiffs' entire capital balance was redeemed, and a portion of the foreign currency that Thermosphere had purchased was distributed to them. On December 27, 2000, plaintiffs

sold the foreign currency and subsequently claimed an ordinary loss.

d. The Legal Opinion From Jenkens on the 2000 COINS Strategy

Shanbrom told Khan, as before, that it would be necessary to obtain an "independent" legal opinion before actually implementing the 2000 COINS Strategy and using it in plaintiffs' income tax returns. According to Shanbrom, only two law firms had the necessary expertise and experience with this type of investment strategy, either Sidley Austin or Jenkens, and he advised Khan to select one of those two firms. Khan chose Jenkens because he had a prior relationship with Jenkens in connection with the 1999 Digital Options Strategy.

In January 2001, Shanbrom telephoned Khan and informed him that the legal opinion from Jenkens was ready. Shanbrom told Khan that he himself had reviewed the legal opinion and had made revisions to it and that, with those revisions, the legal opinion was in final form and ready to go but that Khan would have to send a check to Jenkens before Jenkens would provide him a copy of the legal opinion. (The complaint does not allege that Shanbrom is an attorney.) Khan sent the check to Jenkens, and on January 12, 2001, Jenkens issued him an opinion letter confirming that the 2000 COINS Strategy was "a legal tax-advantaged investment strategy."

According to the opinion letter from Jenkens (as revised by Shanbrom), plaintiffs' basis in their interest in the partnership (Thermosphere), after their contribution of the options, would include the cost of the long option without adjustment for the short option. An adjustment to plaintiffs' basis would be required as a result of the termination of the options, and their disposition of the foreign currency that they had received in redemption of their partnership interest would result in an ordinary loss. The opinion letter

- 17 -

asserted that "'the alleged limitations of [IRS] Notice 2000-44 are more likely than not legally inapplicable to the [2000 Coins Strategy].'"

e. The Preparation and Filing of Plaintiffs' 2000 Income-Tax Returns

BDO prepared and signed plaintiffs' 2000 individual income-tax returns, both the federal and state returns, as well as the 2000 federal income-tax return for Wilshire Investments. Another accounting firm, Grant Thornton, L.L.P., prepared and signed the 2000 federal and state income-tax returns for Thermosphere. These tax returns contained the losses purportedly generated by the 2000 COINS Strategy, and BDO and Grant Thornton advised plaintiffs to sign the returns and file them, assuring them that the returns were "properly prepared in accordance with professional standards" and that the losses generated by the 2000 COINS Strategy were legitimate and usable. On the basis of these assurances, the opinion letter from Jenkens, and defendants' advice, representations, and instructions during the promotion, sale, and implementation of the 2000 COINS Strategy, plaintiffs signed and filed the returns.

f. The IRS Disallows the Losses Generated by the 2000 COINS Strategy

In 2008, the IRS disallowed the losses generated by the 2000 COINS Strategy, just as it disallowed the losses generated by the 1999 Digital Options Strategy. As a result, plaintiffs not only lost the benefit of the fees and premiums they had paid to defendants in connection with the 2000 COINS Strategy, but the IRS also determined that plaintiffs owed a large amount of back taxes, interest, and penalties as a direct result of their participation in this strategy.

3. The 2001 Foreign Currency Derivative Strategy

a. Shanbrom Promotes the Foreign Currency Derivative Strategy

- 18 -

In approximately June 2001, Shanbrom recommended that Shahid R. Khan use the Foreign Currency Derivative Strategy, which Shanbrom characterized as a modification of the COINS Strategy. According to Shanbrom, this new strategy would give "Khan an even greater chance of making substantially more money on the investments than Khan had with the 2000 COINS Strategy," while yielding large tax benefits.

According to the complaint, the 2001 Foreign Currency Derivative Strategy was indeed a variation of the 1999 Digital Options Strategy. It involved making "investments in a managed pooled investment vehicle that invested in foreign currency and related derivative instruments denominated in non-U.S. currency." We need not plunge into the intricacies of this even more byzantine scheme. It appears to boil down to the same thing as the previous two strategies: counting the long options, when calculating the taxpayer's basis in a partnership, without counting the offsetting short options, all for the purpose of generating a tax loss that has little or no relation to any actual economic loss.

b. The Consulting Agreements of November 5, 2001, and September 11, 2002

On November 5, 2001, Flex-N-Gate, Canada, ULC, entered into another "consulting agreement" with BDO. This agreement reads, <u>verbatim</u>, the same as the previous two agreements, except that the term of this agreement is November 5, 2001, to December 31, 2001, and the "consulting fee" is $1,275,000. Thus, the term of this agreement was scarcely longer than a month.

On September 11, 2002, Flex-N-Gate Corporation entered into yet another "consulting agreement" with BDO. Again, the provisions are identical to those in the previous agreements, except that the term is September 11, 2002, to December 31, 2002, and the "consulting fee" is $1,950,000.

- 19 -

c. Legal Opinions From Proskauer and BDO

Again, Shanbrom told Khan he would need an "independent" legal opinion before actually implementing the Foreign Currency Derivative Strategy and using it in his tax returns. This time, Shanbrom recommended Proskauer, "because Proskauer was a very prestigious law firm that had unique expertise and experience with this specific tax-advantaged investment strategy." Khan followed Shanbrom's recommendation and went to Proskauer, which, on April 15, 2002, issued him an opinion letter attesting to the legality of the 2001 Foreign Currency Derivative Strategy and concluding that any losses generated by the strategy could be used in plaintiffs' income-tax returns.

Not only did Shanbrom review Proskauer's opinion letter and make revisions to it before it went out to Khan, but on April 15, 2002, BDO issued to Khan an opinion letter of its own. BDO's opinion letter reached the same conclusions as the opinion letter from Proskauer. BDO opined that the purchased options and sold options would "not be integrated into a single instrument" for purposes of determining plaintiff's basis in the partnership to which plaintiffs were to contribute the options, plaintiffs' tax basis in the purchased options transferred to the partnership would equal the premium they had paid for the options, and the sold options would "not constitute 'liabilities' under Code Section 752."

d. Preparation of Income-Tax Returns by BDO and the IRS's Disallowance of the Losses

In reliance on these opinion letters, plaintiffs decided to use the 2001 Foreign Currency Derivative Strategy. Afterward, in August and October 2002, BDO prepared and signed the 2001 income-tax returns for plaintiffs, claiming the ordinary losses generated by the strategy. In accordance with BDO's advice, plaintiffs signed the returns and filed

them. In 2008, the IRS disallowed the losses reported in these returns, just as it disallowed the losses fabricated by the other two strategies. As a consequence, the fees and premiums plaintiffs had paid for the implementation of the 2001 Foreign Currency Derivative Strategy were useless expenditures, and plaintiffs incurred further liability to the IRS for back taxes, interest, and penalties.

## B. Case No. 09-L-139

### 1. The 2002 Distressed Debt Strategy

#### a. Shanbrom Promotes the 2002 Distressed Debt Strategy

In the spring of 2002, Shanbrom informed Khan that BDO had developed a new investment strategy that was completely different from the Digital Option Strategy and the Foreign Currency Derivative Strategy. According to Shanbrom, this new strategy, the Distressed Debt Strategy, would provide Khan an above-average return on his investment and, at the same time, legally minimize his taxes. Shanbrom recommended that Khan engage in the Distressed Debt Strategy, using the services of BDO and Gramercy Advisors, L.L.C. Khan agreed to do so.

#### b. The Opinion Letters From DeCastro and BDO

Shanbrom recommended that Khan hire DeCastro, a law firm in California, to issue an opinion letter on the 2002 Distressed Debt Strategy. According to Shanbrom, "DeCastro was the only law firm that had the special qualifications and expertise to issue a legal opinion for the 2002 Distressed Debt Strategy."

Unbeknownst to Khan, however, DeCastro was in a conspiracy with BDO to promote and sell the Distressed Debt Strategy. "As part of this scheme, DeCastro agreed that BDO Seidman could promise prospective clients, such as [p]laintiffs, that they would

receive legal opinions certifying the soundness and legality of the Distressed Debt Strategies that [d]efendants convinced the clients to execute." DeCastro collected "a substantial fee" from each client for these legal opinions.

In August 2003, Shanbrom let Khan know that the opinion letter from DeCastro was ready and that Shanbrom had reviewed the letter and had made revisions to it. On August 29, 2003, after receiving a check from Khan, DeCastro issued to him a legal opinion letter certifying that the losses generated by the 2002 Distressed Debt Strategy would be usable in plaintiff's tax returns.

On October 9, 2003, BDO issued an opinion letter to plaintiffs reaching the same conclusions as the DeCastro letter. According to the complaint, both BDO and DeCastro failed to perform a competent analysis of tax law in their opinion letters.

c. The Consulting Agreement of September 11, 2002

On September 11, 2002, Flex-N-Gate Corporation and BDO entered into a consulting agreement having a term of September 11, 2002, to December 31, 2002, and providing for a consulting fee of $1,950,000. This consulting agreement followed the same template as the previous ones, except that the arbitration clause said: "[S]uch dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of Illinois," not New York. Nevertheless, the "Governing Law" clause was the same: "This Agreement shall be governed and construed in accordance with the laws of the State of New York, except for its conflict of law principles."

d. Plaintiffs Engage in the 2002 Distressed Debt Strategy

In November 2002, plaintiffs engaged in the Distressed Debt Strategy. In general terms, here is how the strategy worked. First, business entities organized under the

laws of a foreign country contributed high-basis, low-value assets (distressed debt) to a newly created limited liability corporation (the Contributor LLC), which was taxed as a partnership. Second, the Contributor LLC contributed the distressed debt to another newly formed limited liability corporation (the Receiving LLC). Third, plaintiffs purchased an interest in the Receiving LLC from the foreign entities and contributed other assets, including long and short options on Japanese yen, to the Receiving LLC. Fourth, the Receiving LLC sold the distressed debt at fair-market value, whereupon plaintiffs claimed a loss based on the difference between the face value of the distressed debt and the amount received upon the sale of the distressed debt.

### e. Plaintiffs Claim the Losses in Their Tax Returns

On approximately October 10, 2003, BDO prepared and signed the 2002 individual federal tax return for plaintiffs, and this return contained the losses purportedly generated by the 2002 Distressed Debt Strategy. In reliance on the opinion letters from DeCastro and BDO, plaintiffs signed and filed this return, and, as a result, plaintiffs incurred liability to the IRS for back taxes, interest, and penalties when the IRS disallowed the losses. Plaintiffs also lost a significant amount of money in the form of the fees they paid to BDO and other defendants to carry out the strategy.

### 2. The 2003 Distressed Debt Strategy

In the spring of 2003, Shanbrom met with Khan and told him that BDO had improved the Distressed Debt Strategy so as to give clients an even greater chance of making money on the distressed-debt investments. As before, Shanbrom recommended that Khan obtain an opinion letter from DeCastro confirming the legality of this strategy. DeCastro duly issued the letter, with revisions by Shanbrom. BDO also issued its own

opinion letter to Khan, echoing the conclusions of DeCastro. Flex-N-Gate Corporation and BDO entered into a consulting agreement on September 2, 2003, containing the same provisions as the consulting agreement of September 11, 2002. Plaintiffs engaged in the 2003 Distressed Debt Strategy, which appears to be pretty much the same as the 2002 strategy. The ultimate outcome was the same: in 2008, the IRS disallowed the losses in the 2003 individual federal tax returns prepared by BDO, and, consequently, plaintiffs incurred damages in the form of back taxes, interest, penalties, and wasted fees.

## II. ANALYSIS

### A. Standard of Review

In their motions for dismissal, the BDO defendants cite sections 2-619(a)(1) and (a)(9) of the Code (735 ILCS 5/2-619(a)(1), (a)(9) (West 2008)). Those sections provide for the dismissal of an action on the ground that the court lacks subject-matter jurisdiction (735 ILCS 5/2-619(a)(1) (West 2008)) and on the ground that "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim" (735 ILCS 5/2-619(a)(9) (West 2008)). "Affirmative matter" means a defense other than a negation of the essential elements of the plaintiff's cause of action. Smith v. Waukegan Park District, 231 Ill. 2d 111, 120-21, 896 N.E.2d 232, 238 (2008).

In reviewing a trial court's ruling on a motion for dismissal on the ground that the court lacks subject-matter jurisdiction or on the ground that affirmative matter bars the action, we apply a de novo standard of review, meaning that we perform the same analysis that the trial court was expected to perform and we give no deference to the trial court's decision. Lo v. Provena Covenant Medical Center, 356 Ill. App. 3d 538, 540, 826 N.E.2d 592, 596 (2005); Millenium Park Joint Venture, LLC v. Houlihan, 393 Ill. App. 3d 13, 20,

911 N.E.2d 517, 523 (2009). For purposes of the motion, we consider the movant to have admitted the well-pleaded facts of the complaint, and we interpret not only the pleadings but also all supporting documents in a light most favorable to the plaintiff. Melena v. Anheuser-Busch, Inc., 219 Ill. 2d 135, 141, 847 N.E.2d 99, 103 (2006); Lo, 356 Ill. App. 3d at 540, 826 N.E.2d at 596. We also deem the movant to have admitted the legal sufficiency of the complaint. Kean v. Wal-Mart Stores, Inc., 235 Ill. 2d 351, 361, 919 N.E.2d 926, 931-32 (2009); Lo, 356 Ill. App. 3d at 540, 826 N.E.2d at 596.

Given those admissions and resolving all reasonable inferences in the plaintiff's favor, we " 'must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " Czarobski v. Lata, 227 Ill. 2d 364, 369, 882 N.E.2d 536, 539 (2008), quoting Kedzie & 103rd Currency Exchange, Inc. v. Hodge, 156 Ill. 2d 112, 116-17, 619 N.E.2d 732, 735 (1993). In the present case, the affirmative matter is the arbitration agreement, and there appears to be no factual issue as to its existence: no one denies that it is, physically, the contract and that the signatures thereon are genuine. The remaining question, then, is whether, given the admitted facts of the complaint, the arbitration agreement merits the dismissal of the claims in the complaint--or, more precisely, their consignment to arbitration in lieu of litigation in circuit court. See 710 ILCS 5/2(d) (West 2008) ("Any action or proceeding involving an issue subject to arbitration shall be stayed ***").

B. Who Gets To Decide the Question of Arbitrability?

Citing our supreme court's decision in Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr, 124 Ill. 2d 435, 447-48, 530 N.E.2d 439, 445 (1988), the BDO defendants argue

- 25 -

that to the extent it is unclear whether a claim falls within the scope of the arbitration clause, the arbitrator, instead of the courts, should decide the question of arbitrability. The Supreme Court decided Barr, however, under the Illinois Uniform Arbitration Act (710 ILCS 5/11 through 17 (West 2008)), whereas the Federal Arbitration Act (9 U.S.C. §§1 through 16 (2006)) governs the present case, given that the consulting agreements contemplate the purchase and sale of securities and that such transactions involve commerce (see 9 U.S.C. §2 (2006); Hollingshead v. A.G. Edwards & Sons, Inc., 396 Ill. App. 3d 1095, 1099, 920 N.E.2d 1254, 1258 (2009)). "Under the [Federal Arbitration Act (FAA)] and the case law interpreting it, the question of whether a claim is arbitrable is to be independently decided by the courts, unless the parties 'clear[ly] and unmistakab[ly]' agree to allow the arbitrator to decide arbitrability." Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 181 Ill. 2d 373, 383, 692 N.E.2d 1167, 1172 (1998), quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 994, 115 S. Ct. 1920, 1924 (1995); AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 656, 106 S. Ct. 1415, 1418 (1986); see also United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583 n.7, 4 L. Ed. 2d 1409, 1418 n.7, 80 S. Ct. 1347, 1353 n.7 (1960); Marks v. Bober, 399 Ill. App. 3d 385, 389-90, 926 N.E.2d 801, 804 (2010) (contrasting the procedures for deciding arbitrability under the Illinois and federal statutes).

We find no evidence that the parties in this case clearly and unmistakably agreed that the arbitrator would decide the question of the arbitrability of a given claim. Hence, the question of arbitrability is for the courts to decide.

C. Settling a Claim by Arbitration "in Accordance With" New York Law or Illinois Law

- 26 -

In both case No. 09-L-139 and case No. 09-L-140, plaintiffs try to avoid arbitration by interpreting the arbitration clause in the consulting agreements as excusing the parties from arbitrating a claim whenever state law would excuse them from doing so. The question, however, is whether the parties agreed to that condition on arbitrability. Although "[t]he FAA creates a 'body of federal substantive law of arbitrability' " (Roubik, 181 Ill. 2d at 383, 692 N.E.2d at 1172, quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 74 L. Ed. 2d 765, 785, 103 S. Ct. 927, 941 (1983)), it does not require anyone to agree to arbitration (Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 478, 103 L. Ed. 2d 488, 499, 109 S. Ct. 1248, 1255 (1989)). If parties do not have to agree to arbitration at all, then, by corollary, they can agree to arbitration only on specified conditions. The purpose of the FAA is to "ensur[e] that private arbitration agreements are enforced according to their terms" (Volt, 489 U.S. at 478, 103 L. Ed. 2d at 500, 109 S. Ct. at 1255-56), and if by the terms of an arbitration agreement, the parties must arbitrate a claim only in circumstances in which state law would enforce an arbitration agreement, giving effect to those terms would be "fully consistent with the goals of the FAA" (Volt, 489 U.S. at 479, 103 L. Ed. 2d at 500, 109 S. Ct. at 1256).

Plaintiffs argue that the arbitration clause of the consulting agreements requires arbitration only when it would be "in accordance with" state law to require arbitration. In case No. 09-L-139, the arbitration clause says that "such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of Illinois," and in case No. 09-L-140, the arbitration clause substitutes "New York" for "Illinois." On the basis of this language in the arbitration clause, plaintiffs argue, in case

- 27 -

No. 09-L-139, that they are excused from arbitration under Illinois law because the arbitration provisions are procedurally and substantively unconscionable (see Zobrist v. Verizon Wireless, 354 Ill. App. 3d 1139, 1147-48, 822 N.E.2d 531, 540-41 (2004)), and they argue, in case No. 09-L-140, that they are excused from arbitration under New York law because " 'the alleged fraud was part of a grand scheme that permeated the entire contract, including the arbitration provision' " (Tong v. S.A.C. Capital Management, LLC, 16 Misc. 3d 401, 410, 835 N.Y.S.2d 881, 888-89 (2007), quoting In re Weinrott, 32 N.Y.2d 190, 197, 298 N.E.2d 42, 46 (1973)).

When the arbitration clause refers, however, to the laws of Illinois or New York, it is discussing how arbitration is to be conducted, not whether it will be conducted. Again, the arbitration clause reads as follows:

"If any dispute, controversy or claim arises in connection with the performance or breach of this agreement and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of New York [(or Illinois, in case No. 09-L-139)], and the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association ('AAA'), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in the city in which the BDO office providing the relevant Service exists, unless the parties agree to a different

locale."

Interpreting the phrase "in accordance with the laws of the State of New York" as providing a potential way out of arbitration would nullify the preceding phrase stating that the "dispute, controversy or claim shall be settled by arbitration." (Emphasis added.) The "in accordance" phrase pertains to the procedures by which arbitration shall be conducted. We find confirmation of this interpretation in the context in which the phrase occurs. Like the "Arbitration Rules for Professional Accounting and Related Disputes of the AAA," the laws of Illinois or New York are, in this context, relevant only to the procedures of arbitration. Likewise, the question of prehearing discovery is a question of procedure. Settlement by arbitration "shall" occur, and it shall occur in conformity with certain procedural laws and rules, including those of Illinois or New York.

Because the mention of Illinois law and New York law, in the arbitration clauses, relates only to how arbitration will be conducted rather than to whether it will be conducted, Illinois law and New York law are applicable only to procedural questions, not to the question of arbitrability. The parties must look to Illinois law and New York law for procedural guidance during arbitration. That is what the arbitration clause means.

It is true that, according to the "Governing Law" paragraph, the consulting agreements as a whole are governed by New York law. Nevertheless, even though a contract provides that it is governed by New York law, New York courts apply federal, not state, arbitration law if the contract involves interstate commerce. In re Cone Mills Corp., 90 A.D.2d 31, 32, 455 N.Y.S.2d 625, 627 (1982); Bridas S.A. Petrolera Industrial y Comercial v. International Standard Electric Corp., 128 Misc. 2d 669, 673, 490 N.Y.S.2d 711, 715 (1985). Under the federal substantive law of arbitrability, "regardless of whether the

challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449, 163 L. Ed. 2d 1038, 1046, 126 S. Ct. 1204, 1210 (2006); Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 403-04, 18 L. Ed. 2d 1270, 1277, 87 S. Ct. 1801, 1806 (1967); S. Ware, Arbitration Law's Separability Doctrine After Buckeye Check Cashing, Inc. v. Cardegna, 8 Nev. L.J. 107, 109-10 (2007). The contention that "fraud permeates the entire contract" is directed at the contract as a whole and not specifically to the arbitration clause. See Tong, 16 Misc. 3d at 410, 835 N.Y.S.2d at 888-89. Consequently, such a contention would not affect arbitrability.

### D. The Scope of the Arbitration Clause

#### 1. Investment Advice

As the Supreme Court has said, "arbitration is simply a matter of contract between the parties" (First Options, 514 U.S. at 943, 131 L. Ed. 2d at 993, 115 S. Ct. at 1924), " 'and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit' " (AT&T, 475 U.S. at 648, 89 L. Ed. 2d at 655, 106 S. Ct. at 1418, quoting United Steelworkers, 363 U.S. at 582, 4 L. Ed. 2d at 1417, 80 S. Ct. at 1353). Therefore, the first thing to do is look at the contract and see if the parties agreed to arbitrate the claims in question.

In most of the claims in the complaint, plaintiffs seek to recover damages from BDO for "advising [them] to engage in the Investment Strategies" and for representing to them that they could make a profit from the investment strategies. Thus, we must scrutinize the consulting agreement and determine, de novo, whether plaintiffs agreed to

- 30 -

arbitrate any claim that BDO has wronged them in the giving of investment advice, keeping in mind that we should resolve any doubts in favor of arbitrability. "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 87 L. Ed. 2d 444, 455, 105 S. Ct. 3346, 3354 (1985).

Before examining the parties' intentions as objectively manifested in the consulting agreements, we note who the parties are in the consulting agreements. It has not escaped our attention that none of the plaintiffs signed any of the consulting agreements containing the arbitration clause. Instead, Flex-N-Gate Corporation and Flex-N-Gate, Canada, ULC, signed them through their president, Shahid R. Khan--who signed only in his capacity as president of those two corporations. Nevertheless, plaintiffs do not make the argument that the arbitration clause is inapplicable to them by reason that they are not parties to the consulting agreements, and arguments omitted from a brief are forfeited (210 Ill. 2d R. 341(h)(7)). We do not mean to imply any criticism of plaintiffs for omitting this argument; they might have their reasons for doing so. We just do not want to appear to be oblivious of this seeming discrepancy or to give the impression that we are glossing over it.

So, we will proceed under the assumption that the arbitration clause is binding on plaintiffs, and, again, it reads as follows: "If any dispute, controversy or claim arises in connection with the performance or breach of this agreement and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration ***." Thus, plaintiffs have agreed to arbitrate only those claims that are related to the performance or breach of the

consulting agreement. Because breach is a failure to perform, the scope of the arbitration clause might be expressed more simply as "claims relating to the performance of the consulting agreement."

It is important to realize that the arbitration clause in this case is more narrow than the typical arbitration clause, such as the one in Prima Paint, 388 U.S. at 398, 18 L. Ed. 2d at 1274, 87 S. Ct. at 1803, which referred to "'any controversy or claim arising out of or relating to this Agreement.'" The broader clause in Prima Paint would encompass extra-contractual claims, such as fraud in the inducement of the contract. Prima Paint, 388 U.S. at 406, 18 L. Ed. 2d at 1279, 87 S. Ct. at 1807; J. Zitter, Claim of Fraud in Inducement of Contract as Subject to Compulsory Arbitration Clause Contained in Contract, 11 A.L.R.4th 774, §4(a) (1982). The arbitration clause before us, however, contemplates the arbitration of a narrower class of claims--those relating to the performance of the agreement--not claims relating to the agreement. See Midwest Window Systems, Inc. v. Amcor Industries, Inc., 630 F.2d 535, 537 (7th Cir. 1980).

Accordingly, to determine what claims plaintiffs agreed to arbitrate, we must determine what performances BDO promised to render in the consulting agreements--for, again, only claims pertaining to the performance of the consulting agreement are subject to the requirement of arbitration--and we will interpret the consulting agreements in light of New York law, since they all provide that the agreement as a whole is governed by New York law. Let us begin with the preamble. The preamble of the consulting agreement observes that the client wishes to "sell[] various investments" and to "mak[e] certain other investments," and the preamble defines this proposed selling and making of investments as "the Transactions." The preamble further states that the client wishes BDO to provide

"certain Consulting services in connection with the Transactions" and that BDO, for its part, wishes to provide such consulting services to the client. Hence, the parties contemplate that BDO shall provide consulting services, i.e., advice, to the client in connection with the selling and making of investments.

Then, under the heading of "Services," the agreement spells out BDO's proposed "consulting services":

> "consulting services in conjunction with Transactions, including assistance in determination of sales prices and allocations thereof, assisting the Client and/or his advisors in structuring the Transactions to attain the most beneficial tax results, preparation of the 2000 and 2001 income tax returns for the Client and/or its shareholders, and assisting the Client and/or his representatives in its discussions and/or negotiations with potential purchasers or sellers, on a specifically requested basis, as well as in income and estate tax planning and other personal financial planning. BDO is not in the business of providing investment advice or services, thus, none of the services to be rendered are to be considered as investment advice, and it is understood that the Client is not relying upon BDO for investment advice or services."
>
> (Emphasis in original.)

The consulting agreement does not specify what it means by "structuring the Transactions," but by reference to other language in the same paragraph, we can ascertain what

"structuring the Transactions" does <u>not</u> mean.  Because we should interpret the consulting agreement in such a way that, if possible, no provision therein is rendered superfluous, we should interpret the phrase "structuring the Transactions" so as not to render superfluous the following sentence, with which the quoted paragraph concludes:  "BDO is not in the business of providing investment advice or services, thus, none of the services to be rendered are to be considered as investment advice, and it is understood that the Client is not relying upon BDO for investment advice or services."  (Emphasis omitted.)  See <u>RM 14 FK Corp. v. Bank One Trust Co., N.A.</u>, 37 A.D.3d 272, 274, 831 N.Y.S.2d 120, 123 (2007); <u>Isaacs v. Westchester Wood Works, Inc.</u>, 278 A.D.2d 184, 185, 718 N.Y.S.2d 338, 339 (2000); <u>East 41st Street Associates v. 18 East 42nd Street, L.P.</u>, 248 A.D.2d 112, 114, 669 N.Y.S.2d 546, 549 (1998).  Thus, "structuring the Transactions" does not mean "giving investment advice."

What is "investment advice"?  It would seem reasonable to infer the meaning of "investment advice" from the statutory definition of an "investment advisor," regardless of whether the BDO defendants fully conform to that definition (there is a statutory exception for an accountant "whose performance of such services is solely incidental to the practice of his or her profession" (815 ILCS 5/2.11(2)(i) (West 2008); see also N.Y. Gen. Bus. Law §359-eee(1)(a)(2) (McKinney 2001)).  Section 2.11 of the Illinois Securities Law of 1953 (Securities Law) defines an "investment adviser" as including the following:  "any person who, for compensation, engages in this State in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities."  815 ILCS 5/2.11 (West 2008); see also N.Y. Gen. Bus. Law §359-eee(1)(a) (McKinney 2001)).  Section 2.1 of the Securities

- 34 -

Law in turn defines "security" to include "any put, call, straddle, option, or privilege entered into, relating to foreign currency" and also any "evidence of indebtedness." 815 ILCS 5/2.1 (West 2008); see also N.Y. Gen. Bus. Law §352(1) (McKinney 2001) ("foreign currency orders, calls or options therefor hereinafter called security or securities" and "evidences of interest or indebtedness"). Consequently, "investment advice" appears to include advising others as to the value of options relating to foreign currency and as to the advisability of investing in, purchasing, or selling such options.

In the context of statutory law, "investment advice" has a meaning more specific than "structuring the Transactions." Therefore, we construe "structuring the Transactions" to exclude the act of advising the client as to the value of options relating to foreign currency and as to the advisability of investing in, purchasing, or selling such options (or evidences of indebtedness, such as distressed debt). By this interpretation, we not only avoid rendering superfluous the concluding sentence of the "Services" paragraph of the consulting agreement, which pointedly excludes "investment advice" from BDO's promised performance, but we allow the specific provision to prevail over, or control, the general provision. See Isaacs, 278 A.D.2d at 185, 718 N.Y.S.2d at 339; Bank of Tokyo-Mitsubishi, Ltd., New York Branch v. Kvaerner a.s., 243 A.D.2d 1, 8, 671 N.Y.S.2d 905, 910 (1998).

This interpretation also harmonizes with the preamble of the consulting agreement, which seems to presuppose that the client already knows which investments it wishes to make and sell. "[A] preamble or recital is often an aid to the construction of a written instrument." Canandarqua Academy v. McKechnie, 90 N.Y. 618, 626 (1882). See also Ticonderoga R.R. Co. v. Delaware & Hudson Co., 139 A.D. 542, 543, 124 N.Y.S. 252,

253 (1910); <u>Export & Import Film Co. v. B.P. Schulberg Productions, Inc.</u>, 125 Misc. 756, 758, 211 N.Y.S. 838, 839 (1925). The preamble begins with the recital that "the Client is interested in selling various investments and in making certain other investments ('the Transactions')." Being interested in selling "various investments" implies that the client already owns the "various investments" to be sold. Further, the preamble does not say that the client is interested in "making investments" in a general sense but, rather, that the client is interested in "making <u>certain</u> other investments." (Emphasis added.) In this attributive usage, "certain" means "specific but not explicitly named or stated." New Oxford American Dictionary 280 (2001). Moreover, the preamble declares that "the Client desires BDO to provide certain Consulting services in connection with the Transactions," as if "<u>the</u> Transactions"(<u>i.e.</u>, the investments that the client is going to buy and sell) have already been determined and BDO is going to serve merely an instrumental function in connection with these predetermined "Transactions." (Emphasis added.) Under this interpretation, the caveat that BDO will provide no "investment advice"--that is, no advice as to the value of securities (such as options) and as to the advisability of investing in, purchasing, or selling securities--makes sense, contextually.

In most of their claims, plaintiffs seek to recover from BDO for "advising [them] to engage in the Investment Strategies" and for falsely representing to them that they could make a profit from the investment strategies--in other words, for giving them fraudulent or negligent "investment advice." Because the consulting agreement expressly and specifically excludes "investment advice" from BDO's promised performance, plaintiffs' claims premised on investment advice are not "claim[s] aris[ing] in connection with the performance or breach of this agreement." The arbitration clause is not susceptible to a

- 36 -

plausible interpretation that covers disputes over investment advice, because such an interpretation would collide with the plain language of the written contract. See <u>United Steelworkers</u>, 363 U.S. at 582-83, 4 L. Ed. 2d at 1417, 80 S. Ct. at 1353.

The BDO defendants insist, however, that, in reality, plaintiffs entered into the consulting agreements in connection with investment strategies. As a matter of fact, plaintiffs admit in their complaint that the BDO defendants would not have given them the investment advice unless plaintiffs had entered into the consulting agreement and had paid the fees stipulated therein. Thus, the BDO defendants argue, even if the consulting agreements disavow investment advice as part of BDO's performance, the reality is that most of what plaintiffs were paying for was investment advice and everyone understood that and acted accordingly.

Nevertheless, this argument that practice triumphs over the text of the contractual documents raises a host of problems. This argument flies in the face of (1) the integration clause in paragraph 12 of the consulting agreement, (2) an additional clause in paragraph 12 stating that any amendment or modification of the consulting agreement must be in writing, (3) the parol-evidence rule, and (4) the requirement in section 2 of the Federal Arbitration Act (9 U.S.C. §2 (2006)) that the arbitration agreement be in writing.

"A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent." N.Y. Gen. Oblig. Law §15-301(1) (McKinney 2001). In other words, a different, unwritten agreement that the parties actually put into practice does not change a written agreement containing the stipulation that it can

- 37 -

be changed only in writing. If the written contract purports to express the entire agreement between the parties and provides that no modification will be effective unless it is in a writing signed by both parties, parol evidence will not vary or enlarge a party's agreed-on performance as set forth in the written contract. Columbia Broadcasting System, Inc. v. Roskin Distributors, Inc., 31 A.D.2d 22, 24-25, 294 N.Y.S.2d 804, 806-07 (1968), aff'd, 28 N.Y.2d 559, 561, 268 N.E.2d 128, 129, 319 N.Y.S.2d 449, 450 (1971); Jiffy Sew Corp. v. Paar, 29 A.D.2d 643, 644, 286 N.Y.S.2d 865, 866 (1968).

Similarly, parol evidence is inadmissible to create an ambiguity in a contract that is otherwise clear and unambiguous on its face. Del Vecchio v. Cohen, 288 A.D.2d 426, 428, 733 N.Y.S.2d 479, 481 (2001). "Where there is a written agreement which purports to express the parties' entire agreement, extrinsic evidence that contradicts, varies, or explains the agreement is generally barred by the parol evidence rule." Del Vecchio, 288 A.D.2d at 427, 733 N.Y.S.2d at 480. Thus, the parol-evidence rule bars extrinsic evidence that investment advice really was part of BDO's performance, contrary to the unambiguous sentence in the consulting agreement stating that investment advice would not be part of BDO's performance. See Del Vecchio, 288 A.D.2d at 427, 733 N.Y.S.2d at 480; Koester v. Weber, Cohn & Riley, Inc., 193 Ill. App. 3d 1045, 1049, 550 N.E.2d 1004, 1006 (1989); Pecora v. Szabo, 94 Ill. App. 3d 57, 63, 418 N.E.2d 431, 435-36 (1981).

By relying on circumstances outside the four corners of the consulting agreement as a basis for making defective investment advice a subject of arbitration, we effectively would make an oral modification of the arbitration clause within the consulting agreement. We effectively would amend the arbitration clause to read that "[i]f any dispute, controversy or claim arises in connection with the performance or breach of this agreement

or BDO's rendition of investment advice, then such dispute, controversy or claim shall be settled by arbitration." Arbitration, however, cannot be compelled on the basis of an implied agreement to arbitrate a claim but only on the basis of a written agreement to do so. Ore & Chemical Corp. v. Stinnes Interoil, Inc., 606 F. Supp. 1510, 1516 (S.D.N.Y. 1985). The arbitration clause, by its terms, must cover the dispute. United Steelworkers, 363 U.S. at 582-83, 4 L. Ed. 2d at 1417, 80 S. Ct. at 1353.

For these reasons, we conclude that insomuch as plaintiffs sue BDO for money they lost as a result of BDO's advice to buy and sell options or distressed debts, they are suing BDO for bad investment advice, which is not within the scope of BDO's performance, according to the unambiguous text of the consulting agreement, and which, therefore, is not within the scope of the arbitration cause.

## 2. Legal Opinions

On the one hand, the consulting agreement says, in the "Services" paragraph, that BDO will prepare income-tax returns for the client and will assist the client and its representatives in income-tax planning. On the other hand, the consulting agreement says, in the "No Warranty" paragraph, that BDO's services do not include, and that BDO assumes no responsibility for, "any legal and/or tax opinions regarding any strategies that may be implemented." Further, BDO "advise[s] the Client to retain a law firm for legal and/or tax opinions on any strategies or transactions they enter into."

Because preparing even the simplest income-tax return entails, to some extent, forming a legal opinion on the applicability of certain provisions of tax statutes, one might wonder if the consulting agreement contradicts itself in the "Services" and "No Warranty" paragraphs. We should make a reasonable effort, however, to harmonize

apparently conflicting provisions (Mir v. Mir, 135 A.D.2d 690, 691, 522 N.Y.S.2d 590, 591 (1987)), and we see a way to interpret these two paragraphs so that they are not a mere exercise in obfuscation. The tension between these two paragraphs is owing to the fact that when an accountant prepares income-tax returns, he or she is on the frontier between accounting and the practice of law. See In re Application of the New Jersey Society of Certified Public Accountants, 102 N.J. 231, 239, 507 A.2d 711, 716 (1986) (remarking that in the field of federal income taxation, the legal and accounting phases are frequently " 'so interrelated, interdependent, and overlapping that they are difficult to distinguish.' [Citation.]"). Under the "professional judgment approach," an accountant should recommend the services of an attorney whenever it is necessary to resolve difficult or doubtful legal questions. Certified Public Accountants, 102 N.J. at 242, 507 A.2d at 717; Agran v. Shapiro, 127 Cal. App. 2d Supp. 807, 812-13, 273 P.2d 619, 623 (1954); Gardner v. Conway, 234 Minn. 468, 480, 48 N.W.2d 788, 796 (1951); S. Schwab, Bringing Down the Bar: Accountants Challenge Meaning of Unauthorized Practice, 21 Cardozo L. Rev. 1425, 1444 (2000). The "Services" and "No Warranty" paragraphs take the "professional judgment approach" by saying, in effect, that the preparation of the client's income-tax returns will raise difficult or doubtful legal questions and that the legal evaluations inherent in the proposed tax returns that BDO prepares for the client are merely tentative or provisional until they are validated by a law firm. The tax returns, as drafted by BDO, are in the nature of suggestions, which are subject to the review and approval of a qualified lawyer.

It follows that insomuch as plaintiffs bring claims against BDO for conspiring with Jenkens, Proskauer, and DeCastro to issue sham legal opinions, their claims do not

"arise[] in connection with the performance or breach of [the consulting agreement]," for the consulting agreement plainly states that "BDO's Services hereunder do not include *** any legal and/or tax opinion." The consulting agreement expressly contemplates that a law firm, not BDO, will be responsible for formulating legal or tax opinions. By interfering with, or compromising the integrity of, this process of legal review by a third party, BDO went outside its field of activity as contemplated by the consulting agreement and, therefore, outside the scope of the arbitration clause.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgments in case Nos. 09-L-139 and 09-L-140 insomuch as the court found the counts for breach of contract, i.e., count IX in case No. 09-L-139 and count X in case No. 09-L-140, to be subject to the contractual requirement of arbitration. Otherwise, we reverse the judgments and remand these cases for further proceedings.

Affirmed in part and reversed in part; cause remanded.

STEIGMANN, J., concurs.

TURNER, J., specially concurs in part and dissents in part.

JUSTICE TURNER, specially concurring in part and dissenting in part:

I agree with the majority that the breach-of-contract counts are subject to arbitration in this case. However, I believe the remaining claims are also matters to be settled by the arbitrator. Therefore, I respectfully dissent.

Given the federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone, 460 U.S. at 24-25, 74 L. Ed. 2d at 785, 103 S. Ct. at 941. Moreover, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " AT&T, 475 U.S. at 650, 89 L. Ed. 2d at 656, 106 S. Ct. at 1419, quoting United Steelworkers, 363 U.S. at 582-83, 4 L. Ed. 2d at 1417-18, 80 S. Ct. at 1353.

In case No. 09-L-140, plaintiffs' allegations against BDO are sufficiently connected to the consulting agreements to compel arbitration. The arbitration provisions cover each of plaintiffs' claims because the causes of action alleged arise from the services provided under the consulting agreements. The consulting agreements indicated BDO agreed to provide consulting services in conjunction with "Transactions" and assist plaintiffs in structuring the "Transactions" to attain the most beneficial tax results. Plaintiffs sought damages in part because the IRS determined they owed back taxes, penalties, and interest as a result of the "Investment Strategies." The issues here clearly fall within the scope of the arbitration clauses. See Denney v. BDO Seidman, L.L.P., 412 F.3d

58, 69 (2nd Cir. 2005) (concluding the plaintiffs' claims fell within the scope of the arbitration provision based on the tax, financing, and business consultation services BDO provided).

In case No. 09-L-139, plaintiffs argue the trial court erred in holding the arbitration provisions--which cover disputes "arising in connection with" the performance or breach of the consulting agreements--are broad in scope. Plaintiff cites State Farm Mutual Automobile Insurance Co. v. George Hyman Construction Co., 306 Ill. App. 3d 874, 882, 715 N.E.2d 749, 756 (1999), where this court stated "[a]n arbitration clause that provides 'all disputes arising in connection with' a contract are to be arbitrated has been read narrowly to apply only to claims relating to matters specifically mentioned in the contract."

Defendants, on the other hand, argue the arbitration provisions are broad, clear, and unequivocal.

> "[C]ourts have generally construed 'generic' arbitration clauses broadly, concluding that the parties are obligated to arbitrate any dispute that arguably arises under an agreement containing a 'generic' provision. [Citation.] The particular language which courts have in the past labeled 'generic' demands arbitration of either disputes 'arising out of' or disputes 'arising out of, or related to' the agreement at issue." (Emphasis in original.) Bass v. SMG, Inc., 328 Ill. App. 3d 492, 498, 765 N.E.2d 1079, 1085 (2002).

Moreover, this court has noted "[a]rbitration clauses applying to disputes 'relating to or

arising from' a contract are given broader meaning than those governing disputes 'in connection with' a contract." State Farm, 306 Ill. App. 3d at 883, 715 N.E.2d at 756.

In this case, the arbitration provisions apply to "any dispute, controversy[,] or claim [that] arises in connection with the performance or breach of this agreement." The trial court found the provisions were broad in nature. See Miron v. BDO Seidman, LLP, 342 F. Supp. 2d 324, 330 (E.D. Pa. 2004) (finding this same clause to be broad on its face). I would find the distinction between "in connection with" or "arising out of" to be one of semantics in this case considering that all of plaintiffs' claims represent a "dispute, controversy[,] or claim" and all are related to the "performance or breach" of the consulting agreements. Even if the language of the provisions is given a narrow construction, plaintiffs' claims are well within the scope of the arbitration provisions.

Plaintiffs, however, contend their claims do not fall within the scope of the provisions because BDO intentionally omitted the "Distressed Debt Strategies" from the scope of services to be rendered under the consulting agreements and each agreement stated it did not apply to "investment" advice and services.

All of plaintiffs' causes of action arise from services BDO provided pursuant to the consulting agreements, which stated BDO would provide "certain consulting services in connection with the Transactions." Plaintiffs do not dispute the "Transactions" are the "Distressed Debt Strategies" at issue in their complaint. Plaintiffs' claims concern the tax advice and tax services provided by BDO and seek the recovery of damages for the fees they paid to BDO under the consulting agreements. That the agreements state BDO was not providing "investment advice" does not change the fact that plaintiffs' claims are based on the services BDO did provide under the agreement. Plaintiffs' claims are within the scope

- 44 -

of the arbitration provisions.  See <u>Denney</u>, 412 F.3d at 69.  Therefore, I would affirm the trial court's judgment in these consolidated cases.